ORIGINAL

FILED
DEC 6 2004
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

(1) ROBERTA R. CARPENTER,
SURVIVING JOINT
COTENANT
2935 Joan Lane,
Billings, MT 59102

Plaintiff,

v.

UNITED STATES OF
AMERICA,

Defendant.

**COMPLAINT**
**FOR BREACH OF CONTRACT**
**AND JUST COMPENSATION**

**File No.** 04-1740C

For her Complaint against the defendant United States of America, plaintiff Roberta R. Carpenter, a/k/a Robbie Carpenter, surviving joint cotenant, states and alleges as follows:

**PRELIMINARY ALLEGATIONS**

1. Plaintiff's deceased joint cotenant, Ms. Maxine F. Carpenter, contracted with the United States of America ("the Government") for three loans to provide rental housing ("the three properties") for low- and moderate-income persons ("the housing programs"). The Government entered into these contracts ("the contracts") with plaintiff's deceased joint cotenant by and through its agency, the Farmers Home Administration, United States Department of Agriculture ("FmHA"). Plaintiff's deceased joint cotenant, Ms. Maxine F. Carpenter, and plaintiff came to own the three properties as Joint Tenants with Right of Survivorship. Upon the death of plaintiff's joint cotenant, the interest of Ms. Maxine F. Carpenter in the three properties and the three contracts terminated.

2. While the precise terms of the three contracts vary, each of them permitted plaintiff's deceased joint cotenant and plaintiff, as joint cotenant, to terminate their participation in the Government's housing programs "at the option" of the owner upon prepayment of each housing project's federally made or insured mortgage. Pursuant to the contracts, said optional termination right could be exercised by the owner "at any time" prior to the termination of the fifty (50) year terms of the contracts.

3. Congress in 1988 and 1992 enacted legislation that repudiated the Government's contractual obligation to permit FmHA contract holders to terminate their contracts at any time at their option. As is alleged more fully below, plaintiff contends in this action that the enactment of this legislation anticipatorily repudiates the contracts between defendant and plaintiff. As is her right, plaintiff has elected to treat the Government's anticipatory repudiation as a breach of contract as of the date of Government performance required by each contract, i.e., the date that plaintiff's deceased joint cotenant and/or plaintiff would achieve their option of terminating each contract but for the Government's repudiation. Plaintiff also alleges that said legislation results in a taking of plaintiff's properties without just compensation.

4. Plaintiff seeks to recover in this action the damages she has suffered and continues to suffer as a result of the breaches by the Government of plaintiff's contracts and for just compensation for the taking of her properties.

**(Pre-1979 FmHA Contracts)**

5. Plaintiff's deceased joint cotenant entered into two FmHA contracts before December 21, 1979 ("the pre-1979 FmHA contracts"). Accordingly, plaintiff's joint cotenant

and plaintiff, as joint cotenant, were contractually entitled to terminate their participation in the Government's housing programs by exercising their option to prepay at any time. Such a prepayment would enable them to "go to market" and use or dispose of their properties by either (i) raising the properties' rents to commercial rates; or (ii) selling the properties for their commercial fair market value.

6. The 1988 legislation described below repudiated the contractual right of pre-1979 FmHA contract holders to terminate their contracts at any time at their option.

**(Post-1979 FmHA Contract)**

7. Plaintiff's deceased joint cotenant entered into one FmHA contract on or after December 21, 1979 and before December 15, 1989 ("the post-1979 FmHA contract"). Accordingly, plaintiff's deceased joint cotenant and plaintiff, as joint cotenant, were contractually entitled to exercise their option to prepay at any time. However, by their terms each post-1979 FmHA contract is subject to a fifteen (15) or twenty (20) year restrictive use clause. This clause is binding upon the owners and their successors in interest and requires that the property be operated as low-rent housing for a period of fifteen (15) or twenty (20) years from the date of loan origination.

8. The 1992 legislation described below extended to post-1979 FmHA contract holders the provisions of the 1988 legislation, described below, that had repudiated the contractual termination right of pre-1979 FmHA contract holders.

## THE PARTIES
**(Party Plaintiff)**

9. The plaintiff, Robbie Carpenter, with an address at 2935 Joan Lane, Billings, Montana 59102, is the sole surviving joint cotenant of Ms. Maxine Carpenter, who entered into three contracts for rental housing at the following properties known as:

(i) Project I Apartments, case and project number 31-056-517309660, 02-1, consisting of eight (8) units, which closed on March 10, 1976;

(ii) Project II Apartments, case and project number 31-056-517309660, 01-0, consisting of twelve (12) units, which closed on December 18, 1980; and

(iii) Sage Apartments (Columbus), case and project number 31-048-517309660, 03-3, consisting of twelve (12) units, which closed on October 7, 1975.

**(Party Defendant)**

10. The FmHA is an agency of the defendant. At all times relevant to the allegations in this Complaint, FmHA and its respective officials and employees were acting as agents of the defendant. Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994), the Secretary of the Department of Agriculture was authorized to establish a successor agency to Farmers Home Administration known as Rural Housing and Community Development Services ("RHCDS"). Effective January 30, 1996, RHCDS changed its name to Rural Housing Service ("RHS"). (Agency Name Change, 61 Fed. Reg. 2899 (1996).) RHS is itself part of the area within the Department of Agriculture known as "Rural Development." As

used herein, "FmHA" shall refer to Farmers Home Administration or its successor agencies, as appropriate.

11. An actual controversy exists between the parties.

## JURISDICTION

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491.

## BACKGROUND

13. Prior to the 1960s, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities. During the 1960s and the 1970s, Congress changed its approach and enacted legislation to encourage private developers to construct, own, and manage large numbers of federally assisted housing units for low- and moderate-income residents.

14. In furtherance of this changed approach, Congress authorized FmHA to make or insure loans to private entities in order to stimulate the private development of federally assisted housing for low- and moderate-income and elderly residents in rural areas of the United States. Congress began this program in 1962 by adding Section 515 to the Housing Act of 1949 (Pub. L. No. 87-723, § 4(b), 76 Stat. 671 (1962)) and expanded its scope in 1968 by adding Section 521 to that Act (Pub. L. No. 90-448, Tit. X, § 1001, 82 Stat. 551 (1968))(now codified at 42 U.S.C. §§ 1485 and 1490a, respectively). Housing projects subject to Sections 515 and/or 521 of the Housing Act of 1949 are referred to herein as "FmHA projects."

15. Plaintiff's deceased joint cotenant agreed, under Sections 515 and/or 521 of the Housing Act of 1949, as amended, 42 U.S.C. §§ 1485 and 1490a, to construct, rehabilitate, or improve three housing projects and to enter into Loan Agreements with FmHA. The Loan Agreements, *inter alia*, imposed significant obligations on plaintiff's deceased joint cotenant, and later plaintiff, regarding the tenants to whom the owners could rent, the rents they could charge, the profits they could receive, and the maintenance and financial operation of each project ("the low income affordability restrictions").

16. Contemporaneous with the execution of the Loan Agreement, and referenced therein, the plaintiff's deceased joint cotenant executed, *inter alia*, a Promissory Note and Real Estate Mortgage for each project. In executing the Promissory Note, plaintiff's deceased joint cotenant promised to pay to the order of the Government, in scheduled installments, the entire principal due pursuant to the Loan Agreement, together with interest at a specified rate. The Promissory Note provided, *inter alia*, "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."

17. By signing the Loan Agreements and the Promissory Notes referenced therein, plaintiff's deceased joint cotenant promised, *inter alia*, (i) to construct and maintain housing in accordance with FmHA's specifications; (ii) to use her FmHA projects for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate FmHA regulations; (iii) to charge no higher rents than those permitted by FmHA; (iv) to make timely payments on her mortgages; and (v) to maintain certain cash reserves. In exchange, the Government agreed to allow plaintiff's deceased joint cotenant, and later plaintiff, to free themselves of FmHA's regulatory strictures in accordance with the contractual provisions of

the Promissory Notes subject to FmHA's present regulations and to its future regulations not inconsistent with the express provisions of the Notes.

18. The Loan Agreements obligated the plaintiff's deceased joint cotenant and plaintiff, as joint cotenant, to operate their housing projects in accordance with FmHA regulatory strictures only so long as their indebtedness and other obligations under the Promissory Notes, Real Estate Mortgages, and any related agreements remained unsatisfied. Thus, owners' obligations under their Loan Agreements to operate their housing projects in accordance with FmHA regulations expires upon the prepayment in full of their indebtedness and satisfaction of any related obligations.

19. Consistent with the language of the Promissory Notes, FmHA regulations codified at, *inter alia,* parts 1865, 1866, and 1965, implementing Section 502 of the Housing Act of 1949, 42 U.S.C. § 1472, permitted plaintiff's deceased joint cotenant and plaintiff, as joint cotenant, to prepay their mortgages at any time at their option, so long as they and their successors in interest continued to comply with the restrictive-use clauses, if any, contained in the Real Estate Mortgages.

20. Accordingly, plaintiff's deceased joint cotenant and plaintiff, as joint cotenant, were entitled under their Loan Agreements with FmHA, FmHA's regulations, and the respective Promissory Notes, to terminate their contracts by prepaying their mortgages at any time at their option to enable them to go to market and maximize their return on investment.

21. Notwithstanding the contractual right of plaintiff's deceased joint cotenant and plaintiff, as joint cotenant, to terminate their participation in the Government's housing

programs, the Government repudiated its obligation to recognize their right by enacting the legislation described below.

## CONGRESSIONAL ACTION

### The 1988 Legislation

22. On February 5, 1988, Congress imposed restrictions on prepayment, thereby repudiating the right of pre-1979 FmHA contract holders to exercise their contractual termination right at any time at their option, by enacting Title II of the Housing and Community Development Act of 1987. (Pub. L. No. 100-242, 101 Stat. 1877 (1988), cited as the Emergency Low Income Housing Preservation Act of 1987 (codified as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l* note)("the 1988 legislation" or "ELIHPA").) Congress made certain findings in the 1988 legislation, including but not limited to the following:

> (i) some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 [i.e., FmHA housing units] are threatened with loss as a result of the prepayment of mortgages by owners;
>
> (ii) the loss of this privately owned and federally assisted housing would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing;
>
> (iii) a major review of alternative responses to this threatened loss of affordable housing is now being undertaken by numerous private sector task forces as well as State and local organizations;

(iv) until the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

The 1988 legislation, Section 202(a).

**(The 1988 Legislation's Prepayment Restrictions For Pre-1979 FmHA Contracts)**

23. Congress estimated that a large portion of the 367,000 units owned by both pre-1979 and post-1979 loan holders and originating between 1963 and 1985 were vulnerable to being prepaid during the few years following 1988. Post-1979 FmHA loan holders, however, unlike pre-1979 loan holders, already were contractually required to maintain their projects as low- and moderate-income housing for fifteen (15) or twenty (20) years. Thus, until such time as Congress could act on recommendations resulting from the continuing reviews of alternative responses to the perceived imminent loss of affordable housing and devise a permanent solution for all FmHA loans, the 1988 legislation confined itself to dealing only with the pre-1979 FmHA loans, i.e., those FmHA loans originating from 1963 to 1979.

24. The 1988 legislation contained measures designed to place the pre-1979 FmHA contract holders "on the same playing field" as the post-1979 FmHA contract holders already subject to a restrictive-use clause. For example, a pre-1979 FmHA contract holder could avoid a forced sale of its project by agreeing to extend its low-income use for a period of not less than twenty (20) years from the date of loan origination. The 1988 Legislation, Section 241.

25. Although denominated as an "interim measure," the 1988 legislation specifically amended existing law -- Section 502(c) of the Housing Act of 1949 -- and did not

expire automatically. Instead of repealing the "interim measures" directed at pre-1979 FmHA contract holders, Congress devised, in 1992, a permanent response for all FmHA loans, including those post-1979 loans with contractual termination rights.

26. Consistent with the provisions of existing post-1979 FmHA contracts containing restrictive-use clauses, the 1988 legislation recognized the contractual right of post-1979 FmHA loan holders to terminate their contracts by prepaying their loans at any time at their option provided that the projects were maintained as low- and moderate-income housing for a period of fifteen (15) or twenty (20) years from the date of loan origination.

27. Contrary to the provisions of pre-1979 FmHA contracts, the 1988 legislation repudiated the contractual right of FmHA contract holders to terminate their contracts at any time at their option. The 1988 Legislation, Section 241.

**The 1992 Legislation**

28. On October 28, 1992, Congress amended Section 502(c) of the Housing Act of 1949 by enacting the Housing and Community Development Act of 1992 (Pub. L. No. 102-550, § 2 & Tit. VII, § 712, 106 Stat. 3681, 3841 (1992)(codified in relevant part at 42 U.S.C. § 1472(c))("the 1992 legislation or Title VII").) This amendment eliminated the interim measure status of the 1988 legislation's provisions repudiating the contractual right of pre-1979 FmHA loan holders to terminate their contracts at any time at their option.

29. In addition to making permanent the temporary repudiation of the contractual termination rights of pre-1979 FmHA loan holders, the 1992 legislation made permanent for all contracts formed before 1989 the restrictions that ELIHPA had imposed on pre-1979 FmHA contracts. (42 U.S.C. § 1472(c)(4)(A), as amended.)

30. For the first time, the 1992 legislation permanently applied ELIHPA's restrictions to all FmHA contracts entered into before 1989. The statute made no exception for contracts entered into before 1979, nor did it single out (as ELIHPA had done for pre-1979 contracts) any special treatment for those contracts entered into between 1979 and 1989. Thus, the 1992 legislation, signed into law by the President on November 2, 1992, together with implementing regulations, permanently repudiates the contractual termination right of any FmHA loan holder who chooses to terminate its contract.

31. Pursuant to the 1992 legislation, holders of both pre-1979 and post-1979 FmHA contracts are permitted to terminate their contracts by prepaying their loans only in accordance with specified, non-contractual restrictions, including but not limited to the requirement that, before accepting any offer to prepay, the Secretary must make reasonable efforts to enter into an agreement to extend the low-income use of FmHA projects for not less than a period of twenty (20) years beginning on the date the agreement is executed. The 1992 Legislation, Section 712, 42 U.S.C. § 1472(c)(4)(A).

32. The 1992 legislation authorizes FmHA, subject to various conditions and at its discretion, to offer limited, specified "incentives" to holders of FmHA contracts which, along with the threat of the forced property sales discussed below, are designed to induce said contract holders to extend the low-income use of their projects. In general, the incentives allowed owners whose projects satisfied various guidelines to apply for: (i) increases in the rate of return on investment; (ii) reductions of the interest rate on the mortgage loan; (iii) additional rental assistance; and (iv) an equity loan. 42 U.S.C. § 1472(c)(4)(B).

33. The appraisal guidelines used by FmHA to determine incentives are inconsistent with standard appraisal guidelines and result in value determinations below fair market value.

34. For those FmHA project owners unwilling or unable to extend their participation in the Government's housing programs by acquiescing to the "incentives" outlined above, the 1992 legislation provides for forced sales of said owners' properties to nonprofit organizations or public agencies approved by FmHA which are required to maintain the projects as low income housing, subject to FmHA's approval of financial assistance to the prospective purchasers. Under the lengthy, cumbersome, and costly procedures required, such owners are required to offer their properties for sale to such purchasers for an extended period without receiving "incentives" or any other compensation. 42 U.S.C. § 1472(c)(5)(A) - (F).

35. Such forced sale proceedings can be avoided only if (i) the FmHA project owner agrees to continue to operate its project as low-income housing for a period determined by the Secretary, but not less than twenty (20) years from the date of loan origination, and to subject itself to the forced sale proceeding at the end of that period; or (ii) if the Secretary determines that housing opportunities for minorities will not be materially affected as a result of the prepayment and that either (a) tenants will not be displaced; or (b) there is an adequate supply of affordable rental housing within the market area of the housing that is assured of being made available to all current tenants. 42 U.S.C. § 1472(c)(5)(G).

**Material Terms**

36. Plaintiff's contractual right to terminate her contracts at any time at her option was a material term of her contracts. In the absence of this contractual termination right, the contracts with FmHA would not have been executed. But for the legislation repudiating the contractual termination right of plaintiff's deceased joint cotenant and plaintiff, they would have achieved their option of terminating the contracts on those dates that would maximize their investment return on their properties, or on such other dates as they would deem appropriate given their individual circumstances.

37. Plaintiff's deceased joint cotenant and plaintiff have complied fully and in good faith in all material respects with the terms and conditions of their contracts and have otherwise fully performed their undertakings in connection therewith.

**THE IMPACT OF THE REPUDIATING LEGISLATION UPON PLAINTIFF**

38. The statutory scheme under the 1988 and 1992 legislation and FmHA's implementing regulations repudiate the contractual right of FmHA project owners to terminate their contracts at any time at their option in part by (i) compelling them to extend the low-income use of their projects; and (ii) subjecting them to forced sales of their properties. The Government's repudiation does not constitute a failure to carry out any immediate duty of present performance unless and until the date of Government performance required by each contract arrives, i.e., the date that any FmHA contract holder would have achieved its option of terminating its contract but for the Government's repudiation. Thus, the Government's scheme constitutes an anticipatory repudiation of the contractual termination right.

39. The legislation complained of herein also results in a taking of property for public use without just compensation. By requiring plaintiff's deceased joint cotenant and plaintiff to house low-income tenants and to accept new low-income tenants, the Government has (i) conscripted the above-described properties for public use; (ii) physically invaded or authorized others to physically invade said properties; and (iii) deprived plaintiff's deceased joint cotenant and plaintiff of their distinct investment-backed expectations with regard to their properties, all without providing any just compensation.

## DAMAGES

40. But for the Government's wrongful repudiation, the mortgage loans for the pre-1979 projects at issue here, Project I Apartments and Sage Apartments (Columbus), would have been prepaid on November 1, 1999. But for the Government's wrongful repudiation, the mortgage loan for the post-1979 project at issue here, Project II Apartments, would have been prepaid upon the expiration of the twenty-year restrictive use clause applicable to that property, *i.e.*, December 18, 2000.

41. Thus, the plaintiff in this action commenced this civil action within six years after the date that, but for the Government's repudiation of the contract right at issue here, the mortgage loans on the above-described properties would have been prepaid, and the contracts with the FmHA terminated.

42. Plaintiff's deceased joint cotenant and/or plaintiff were ready, willing, and able to pay off the mortgage loan balances on each of the above-described properties at the time that they intended to exercise their right to prepay and leave the Section 515 program.

43. As a consequence of the Government's conduct, plaintiff's deceased joint cotenant and/or plaintiff caused prepayment applications to be submitted for each of the following properties upon the following dates: Project I Apartments and Sage Apartments (Colmbus) on November 1, 1999, and Project II Apartments on November 10, 2000.

44. Following the submission of said prepayment requests, plaintiff's deceased joint cotenant and/or plaintiff met with, or otherwise made inquiries of, FmHA officials regarding prepayment of their loans. Said Government officials have repeatedly represented to plaintiff's deceased joint cotenant and plaintiff that prepayment without restrictions would not be accepted.

45. The incentives and other alternatives potentially provided by the 1988 and 1992 legislation and implementing regulations are wholly inconsistent with owners' original contract rights. Among other things, said incentives and alternatives would require owners to negotiate substitute alternative transactions – with the party who repudiated their contracts – that that would expose them to unreasonable financial risks. Moreover, said incentives and alternatives fall far short of compensating owners for the damages they have suffered and will continue to suffer as a result of the Government's repudiation of their contracts, and would not provide just compensation to owners for the taking of their properties for public use.

46. As a result of the Government's repudiation of the contractual termination right, plaintiff has been (i) deprived of her right to use or dispose of the above-described properties as she sees fit; (ii) compelled to allow the Government to use or authorize others to purchase and use said properties to fulfill the Government's undertaking to provide low-cost rental housing to a segment of the public meeting Government eligibility standards; and (iii)

required to continue to comply with the costly restrictions and obligations imposed upon her by the Loan Agreements.

47. But for the Government's conduct, plaintiff's deceased joint cotenant and/or plaintiff would have terminated their contracts by prepaying their mortgage loans and converting their properties into commercial housing for which they could obtain rents at market rates in excess of the rents chargeable to low- and moderate-income tenants under the Government's programs. The Government has deprived and will deprive plaintiff of the value of increased rents she would receive because its repudiation of the contractual termination right has prevented any prepayment, and consequently any increase in rents, from taking place.

48. Plaintiff has suffered other, additional damages including without limitation the lost opportunity costs associated with investment and business opportunities plaintiff has been foreclosed from pursuing by virtue of her inability to exercise the contractual right to terminate the contracts at any time at her option.

**COUNT ONE**

(Breach of Contract)

49. Plaintiff incorporates paragraphs 1 through 48 by reference as if fully set forth herein.

50. Defendant's legislation anticipatorily repudiated the above-described contracts. The Government's anticipatory repudiation has deprived and will deprive plaintiff of her contractual right to terminate said contracts at any time at her option before the expiration date of their fifty (50)-year contract terms. The Government's anticipatory repudiation constitutes

a breach of plaintiff's contracts as of the date of Government performance required by each contract, i.e., the date that the owner would terminate its contract but for the Government's repudiation.

51. As a direct and proximate result of defendant's conduct, plaintiff has been damaged in an amount which will be proven at trial. Plaintiff is continuing to suffer injury and resulting damages each day that she is denied the ability to exercise the contractual termination right and go to market with her properties at any time at her option.

## COUNT TWO

(Just Compensation)

52. Plaintiff incorporates paragraphs 1 through 51 by reference as if fully set forth herein.

53. As of the date of Government performance required by each of the above-described contracts, defendant's conduct constitutes a taking of plaintiff's real and intangible property interests for public use and requires payment to plaintiff of just compensation under the Fifth Amendment to the U.S. Constitution.

54. Plaintiff is entitled to just compensation for the taking of her properties in an amount which will be proven at trial. Plaintiff is continuing to suffer injury and resulting damages each day that she is denied the ability to convert her properties to market rate or conventional properties.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment as follows:

**AS TO COUNT ONE**

1. That the Court award plaintiff monetary relief for the damages suffered to date and for the damages plaintiff continues to suffer as a result of defendant's breaches of contracts, in an amount to be determined at trial.

**AS TO COUNT TWO**

2. That the Court award plaintiff just compensation during the period during which plaintiff's properties have been taken for public use by defendant, in an amount to be determined at trial.

**AS TO ALL COUNTS**

3. That the Court award plaintiff her attorneys' fees and expenses as allowed pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c), and other applicable law.

4. That the Court award plaintiff her costs and interest as allowed by law.

5. That the Court grant such other and further relief as the law and the evidence may justify and as the Court may deem just and proper.

Dated: December 3, 2004

Respectfully submitted,

By: [signature]

Jeff H. Eckland

Attorney for Plaintiff

ECKLAND & BLANDO LLP
Mark J. Blando, Of Counsel
700 Lumber Exchange
10 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: (612) 305-4440
Telecopy: (612) 305-4439