No. 04-1740C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ROBERTA R. CARPENTER,
Surviving Joint Cotenant,

Plaintiff,

v.

THE UNITED STATES,

Defendant

---

# DEFENDANT'S MOTION TO DISMISS

---

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-7643

Attorneys for Defendant

February 7, 2005

## TABLE OF CONTENTS

DEFENDANT'S MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I. Carpenter's Breach of Contract Claim Must Be Dismissed for Lack of Privity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II. The Alleged Governmental Actions Did Not Constitute a Taking of Carpenter's Property . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A. The Alleged Governmental Actions Did Not Violate Any Property Rights Belonging to Carpenter . . . . . . . . . . . . . 12

B. The Government Did Not Effect an Uncompensated Taking under The Penn Central Test . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1. The Government's Actions Did Not Interfere with Reasonable Investment-backed Expectations . . . . . . . . . . . 15

2. The Economic Impact of the Government's Action Was Not Sufficient to Constitute a Taking . . . . . . . . . . . 17

3. The Character of the Government's Actions Does Not Indicate a Taking . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

Adams v. United States, 391 F.3d 1212 (Fed. Cir. 2004) .............................................. 13

California Housing Security, Inc. v. United States, 959 F.2d 955 (Fed. Cir. 1992) .............................................. 15

Cienega Gardens v. United States, 194 F.3d 1231 (Fed. Cir. 1998), cert. denied, 528 U.S. 820 (1999) .............................................. 10

Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) .................. 16, 17, 18

Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810 (Fed. Cir. 1984) .............................................. 10

First Hartford Corporation Pension Plan & Trust v. United States, 194 F.3d 1279 (Fed. Cir. 1999) .............................................. 10

Franconia Associates v. United States, 536 U.S. 129 (2002) ........................................ 14

Golden Pacific Bancorp v. United States, 15 F.3d 1066 (Fed.Cir.1994) ....................... 15

M & J Coal Co. v. United States, 47 F.3d 1148 (Fed. Cir. 1995) ................................. 16

Parkridge Investors, Ltd. v. Farmers Home Administration, 13 F.3d 1192 (8th Cir. 1994) .............................................. 16, 18

Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978) .................... 15

## FEDERAL STATUTES

Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877 (1988) .............................................. 2

Housing Act of 1949, §§ 515, 521, 42 U.S.C. § 1485, 1490a ........................................ 1

Housing and Community Development Act of 1980, Pub.L. No. 96-399, 94 Stat. 1614 (1980)) .............................................. 5

Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992) .............................................. 2

Housing and Community Development Amendments of 1979,

Pub. L. No. 96-153, 93 Stat. 1101 (1979) .......... 5

Pub. L. No. 87-723, 76 Stat. 670 (1962) .......... 4

Pub. L. No. 89-754, § 804, 80 Stat. 1255, 1282 (1966) .......... 4

Pub. L. No. 90-448, § 1001, 82 Stat. 551 (1968) .......... 4

Pub. L. No. 100-242, § 241, 101 Stat. 1886 .......... 6

Pub. L. No. 100-242, § 241, 101 Stat. 1886-87 .......... 6

Pub. L. No. 100-242, § 241, 101 Stat. 1887 .......... 6

Pub. L. No. 100-242, § 241, 101 Stat. 1889 .......... 6

Pub. L. No. 102-550, § 712, 106 Stat. 3841 (1992) .......... 7

42 U.S.C. § 1472(c)(4)(A), (B) .......... 7

42 U.S.C. § 1472(c)(5)(A) .......... 8

42 U.S.C. § 1472(c)(5)(A)(i) .......... 17

42 U.S.C. § 1472(c)(5)(A)(i) .......... 18

42 U.S.C. § 1472(c)(5)(G)(ii)(I) .......... 17

42 U.S.C. § 1472(c)(5)(G)(ii)(II) .......... 17

42 U.S.C. § 1472(c)(5)(H) .......... 8

42 U.S.C. § 1485 (1994)) .......... 4

**FEDERAL REGULATIONS**

53 Fed. Reg. 13245 (April 22, 1988) .......... 8

7 C.F.R. Part 1900, Subpart B .......... 9

7 C.F.R. § 1965.90 (1989) .......... 8

7 C.F.R. § 1965.215 .......... 8

7 C.F.R. § 1965.215(c)(1)(ii) .......... 17

7 C.F.R. § 1965.215(c)(1)(iii) .......... 17

7 C.F.R. § 1965.215(g) .......... 9

7 C.F.R. § 1965.216 .......... 17

7 C.F.R. § 1965.216(a) .......... 9

**MISCELLANEOUS**

H. Rep. No. 96-154, 96th Cong., 1st Sess. 43 (1979), reprinted in 1987 U.S.C.C.A.N. 2317 .......... 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROBERTA R. CARPENTER,<br>Surviving Joint Cotenant,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-1740C<br>(Judge George W. Miller) |

DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims, defendant respectfully requests the Court to dismiss plaintiff's complaint for lack of jurisdiction or for failure to state a claim upon which relief can be granted. In support of this motion, we rely upon the complaint[1] and the following brief.

DEFENDANT'S BRIEF

Nature Of The Case

Plaintiff, Roberta R. Carpenter ("Carpenter"), alleges that she is the owner, as surviving joint cotenant, of three rental housing projects that were the subject of loan agreements between the deceased joint cotenant – Maxine F. Carpenter ("the borrower") – and the Farmers Home Administration, United States Department of Agriculture ("FmHA"),[2] pursuant to sections 515 and 521 of the Housing Act of 1949, 42 U.S.C. § 1485, 1490a, to provide rental housing for low- and moderate-income individuals and families in rural areas. Complaint ¶¶ 1, 5, 7, 9, 15-17.

---

[1] For the purposes of this motion only, the factual allegations contained in plaintiffs' complaint will be treated as true.

[2] The Rural Housing Service is the successor agency to the Farmers Home Administration. For purposes of this brief, "FmHA" refers to the Farmers Home Administration or the Rural Housing Service, where appropriate.

Carpenter alleges that the Government breached these agreements, or effected a taking of her property without just compensation, through the enactment and implementation of two statutes: the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIHPA"), and the Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992) ("the 1992 Act").

Specifically, the loan agreements contained various provisions designed to ensure the low-income affordability of the projects. These provisions included restrictions as to the tenants to whom the borrower could rent, the rents the borrower could charge, and the profits the borrower could receive, as well as requirements regarding the maintenance and financial operations of each project. Complaint ¶ 15. In connection with these loan agreements, the borrower executed a promissory note and real estate mortgage for each project. Complaint ¶ 16. According to Carpenter, these documents also provided the borrower and her with the option of prepaying the mortgages, and thereby discontinuing the low-income affordability restrictions, at any time, Complaint ¶¶ 16-17, except that, in the case of the loan made after December 21, 1979, the terms of the loan documents required that the low-income affordability of the housing be maintained for a 20 year period following the date of the loan. Complaint ¶¶ 7-8, 40.

Carpenter complains that ELIHPA amended the Housing Act of 1949 to place restrictions upon the prepayment options available to housing project owners who had entered into mortgages prior to December 21, 1979, Complaint ¶ 24, and that the 1992 Act extended these prepayment restrictions to loans made between 1979 and 1989, Complaint ¶ 29. Carpenter alleges that this legislation repudiated the purported right of these program participants to prepay their loans and "terminate" their loan agreements at any time. Complaint ¶ 27. In Count One of

their complaint, Carpenter asserts a claim for breach of contract, upon the theory that this legislation "anticipatorily repudiated" the contracts in question, and that this "anticipatory repudiation has deprived and will deprive plaintiff of her contractual right to terminate said contracts at any time at her option . . . ." ¶ 50. In Count Two, Carpenter alleges that "defendant's conduct constitutes a taking of plaintiffs' real and intangible property interests for public use and requires payment to plaintiffs of just compensation under the Fifth Amendment to the U.S. Constitution." ¶ 53.

The complaint does not allege, however, that Carpenter was ever a party to the contracts in question, or to any contract with the Government. Absent allegations indicating privity of contract with the Government, there is no applicable waiver of sovereign immunity or source of jurisdiction in this Court to entertain the contract claims asserted, nor does the complaint state a cause of action for breach of contract.

The complaint also fails to state a cause of action for a taking of property without just compensation. To the extent that the property purportedly taken was a right under the alleged contracts, the takings claim fails for the same reason as the contract claims: the complaint alleges no facts indicating that Carpenter possessed any rights under these contracts. To the extent that the property purportedly taken was an interest in the housing projects described in the complaint, the takings claim fails for lack of any allegation that Carpenter possessed any interest in these projects at the time of the Government actions that are alleged to constitute a taking. Additionally, it is clear from the complaint that the projects were subject to the challenged use restrictions before she acquired any interest in these projects, and that she was on notice that these restrictions were to remain in effect until the loan was paid in full. If, as Carpenter alleges,

the borrower possessed a contractual right to terminate these restrictions by prepaying the loan, this right belonged to the borrower, not Carpenter. Thus, the facts alleged in the complaint do not amount to a violation of any right belonging to Carpenter. Finally, even assuming that it is proper to blur the distinction between Carpenter and the borrower as the complaint does, the takings claim fails because the facts alleged do not amount to a taking.

## STATUTORY AND REGULATORY BACKGROUND

In 1962, Congress amended the Housing Act of 1949 ("the Housing Act") to authorize the FmHA to make direct loans to private nonprofit corporations and consumer cooperatives "to provide rental housing and related facilities for elderly persons and families of low or moderate income in rural areas." Pub. L. No. 87-723, 76 Stat. 670 (1962) (codified, as amended, at 42 U.S.C. § 1485 (1994)). The loans were to be made for terms of up to 50 years, with repayment of principal and interest according to schedules and repayment plans established by the FmHA. Id. In 1966, Congress expanded this loan program to include loans for rental housing for "other persons and families of low income." Pub. L. No. 89-754, § 804, 80 Stat. 1255, 1282 (1966). In 1968, Congress added section 521 to the Housing Act, which expanded the availability of loans made under section 515. Pub. L. No. 90-448, § 1001, 82 Stat. 551 (1968).

In 1979, Congress found that many section 515 participants had started to prepay their mortgages, thus threatening the continued availability of rural low and moderate income housing. Finding that it had been "the clear intent of Congress that these projects be available to low and moderate income families for the entire original term of the loan," Congress amended the National Housing Act to prevent the loss of low-cost rural housing due to prepayments. H. Rep. No. 96-154, 96th Cong., 1st Sess. 43 (1979), reprinted in 1987 U.S.C.C.A.N. 2317, 2359. In the

Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101 (1979), Congress prohibited the FmHA from accepting prepayment of any loan made before or after the date of enactment unless the owner was required to maintain the low-income cost of the rental housing for either a 15-year or 20-year period from the date of the loan. § 503(b), 93 Stat. 1134-35. This requirement would not be imposed if the FmHA determined that there was no longer a need for the low-cost housing or if Federal or other financial assistance provided to residents would no longer be provided. Id. In 1980, Congress further amended the Housing Act to eliminate retroactive application of the section 515 prepayment changes enacted in the 1979 legislation. Section 514 of the Housing and Community Development Act of 1980, Pub. L. No. 96-399, 94 Stat. 1614 (1980), provided that the prepayment restrictions included in the 1979 legislation would apply only to loans entered into after the date of enactment of that legislation, December 21, 1979. 94 Stat. 1671-72.

By 1987, Congress again had become concerned about the availability of low- and moderate-income rural housing in the face of increasing prepayments of mortgages under section 515. In response, Congress passed ELIHPA, which amended the Housing Act of 1949 to impose restrictions upon prepayment of section 515 mortgages that were entered into before December 21, 1979. This legislation required that, prior to accepting an offer to prepay a mortgage entered into before December 21, 1979, the FmHA

> shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities for not less than the 20-year period beginning on the date on which the agreement is executed.

Pub. L. No. 100-242, § 241, 101 Stat. 1886. The legislation further provided that the FmHA could include certain enumerated incentives in such an agreement, including an increase in the rate of return on investment, reduction of the interest rate on the loan, and an equity loan. Pub. L. No. 100-242, § 241, 101 Stat. 1886-87.

Under ELIHPA, if the FmHA determined after a "reasonable period" that an agreement would not be reached, and that housing opportunities for minorities would be materially affected by the prepayment, then the FmHA would require the owner to offer to sell the housing to "any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." Pub. L. No. 100-242, § 241, 101 Stat. 1887. If an offer to purchase was not made within 180 days, the FmHA could accept the offer to prepay or request refinancing. Id. The offer for sale requirement would not apply if the owner agreed to utilize the housing for the purposes set out in section 515 for a period designated by the FmHA and then offer to sell the housing to a nonprofit organization or public agency. If the FmHA determined that housing opportunities for minorities would not be materially affected by prepayment but that tenants either would be displaced by prepayment or that there is not an "adequate supply" of "affordable" housing in the market area available to displaced tenants, then a borrower could prepay as long as the borrower agreed not to raise rents to force out current tenants. Id. at § 241, 101 Stat. at 1889. If the FmHA determined that housing opportunities for minorities would not be materially affected by prepayment and that the tenants either would not be displaced by prepayment or there was an "adequate supply" of "affordable" housing in the market area available to displaced tenants, then a borrower could prepay without restriction. Id. at § 241, 101 Stat. at 1889.

In the 1992 Act, Congress extended the prepayment restrictions contained in ELIHPA to section 515 loans made from December 21, 1979 until December 15, 1989. Pub. L. No. 102-550, § 712, 106 Stat. 3841 (1992). Thus, beginning in 1992, loans made after December 21, 1979 but before 1989 were subject to the provisions of ELIHPA adopted in 1988 for "pre-1979" loans.

In their present form, the pertinent statutory provisions concerning prepayment of section 515 loans are as follows:

> (A) Agreement by borrower to extend low income use
>
> Before accepting any offer to prepay, or requesting refinancing in accordance with subsection (b)(3) of this section of, any loan made or insured under section 1484 or 1485 of this title pursuant to a contract entered into prior to December 15, 1989, the Secretary shall make <u>reasonable efforts to enter into an agreement with the borrower</u> under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities involved for not less than the 20-year period beginning on the date on which the agreement is executed.
>
> (B) Assistance available to borrower to extend low income use
>
> To the extent of amounts provided in appropriation Acts, the agreement under subparagraph (A) may provide for 1 or more of the following forms of assistance that the Secretary, after taking into account local market conditions, determines to be necessary to extend the low income use of the housing and related facilities involved:
>
> [Subsections (B)(i) through (B)(vi) list the various incentives that may be offered in order to obtain such agreements.]
>
> * * *

42 U.S.C. § 1472(c)(4)(A), (B) (emphasis added). Section 1472(c)(5) goes on to state:

> (A) Offer to sell to nonprofit organizations and public agencies
>
> (i) In general

> If the Secretary determines after a reasonable period that an agreement will not be entered into with a borrower under paragraph (4), the Secretary shall require the borrower (except as provided in subparagraph (G)) to offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers, one of whom shall be selected by the Secretary and one of whom shall be selected by the borrower. If the 2 appraisers fail to agree on the fair market value, the Secretary and the borrower shall jointly select a third appraiser, whose appraisal shall be binding on the Secretary and the borrower.
>
> (ii) Period for which requirement applicable
>
> If, upon the expiration of 180 days after an offer is made to sell housing and related facilities under clause (i), no qualified nonprofit organization or public agency has made a bona fide offer to purchase, the Secretary may accept the offer to prepay, or may request refinancing in accordance with subsection (b)(3) of this section of, the loan. This clause shall apply only when funds are available for purposes of carrying out a transfer under this paragraph.

42 U.S.C. § 1472(c)(5)(A) (emphasis added). The statute includes a funding authorization sufficient to finance the transfer of 5,000 units per fiscal year. 42 U.S.C. § 1472(c)(5)(H). (According to the complaint, a total of 32 units are involved in this case. Complaint ¶ 9.)

The FmHA promulgated regulations to implement ELIHPA on April 22, 1988, and these regulations became effective on May 23, 1988. 53 Fed. Reg. 13245 (April 22, 1988), codified at 7 C.F.R. § 1965.90 (1989). Current regulations governing section 515 prepayments establish a process by which the FmHA addresses prepayment requests, including procedures for determining whether housing opportunities for minorities will be affected by prepayment and whether other housing is available for tenants displaced by prepayment. 7 C.F.R. § 1965.215. These procedures include a right of borrowers to appeal an agency decision to deny prepayment

without restrictive use provisions. 7 C.F.R. § 1965.215(g). Section 1965.215(g) provided that such appeals are to be processed in accordance with the procedures set forth in 7 C.F.R. Part 1900, Subpart B. Pursuant to the latter regulation, appeals are heard by a hearing officer from the National Appeal Staff of the Department of Agriculture, and the hearing officer's decision is subject to review by a separate reviewing officer from that Staff. 7 C.F.R. Part 1900, Subpart B, Exhibit D.

In cases where the borrower opts to offer the property in question for sale to a nonprofit organization or public agency for fair market value (or where doing so is a prerequisite to prepayment because of the effect of prepayment upon minorities), the regulations provide that "the fair market value of the project as unsubsidized conventional housing will be determined." 7 C.F.R. § 1965.216(a) (emphasis added). The regulation further provides:

> The value arrived at will result from two appraisals. One appraisal will be the appraisal contracted and paid for by FmHA or its successor agency under Public Law 103-354 that was used to establish the incentives previously offered. The second appraisal will be obtained and paid for by the borrower. Both appraisals will be conducted by qualified independent appraisers in accordance with FmHA . . . Instruction 1922-B (available in any FmHA . . . office).[[3]] If the fair market values arrived at are within 10 percent of each other, the Servicing Office and the borrower will negotiate to arrive at a mutually acceptable value. If the values differ by more than 10 percent, the independent appraisers will be asked to review their appraisals to determine if the values can be reconciled to within 10 percent. If FmHA . . . and the borrower are unable to negotiate a mutually acceptable value or the appraisers are unable to reconcile their appraisals within 30 days of the completion of the appraisals, the State Office and the borrower will jointly select a third independent qualified appraiser whose appraisal will be

[3] Instruction 1922-B is not published in the Code of Federal Regulations, but it is publicly available on the internet at http://rdinit.usda.gov/regs/regs/txt/1922b.txt.

> binding on FmHA . . . and the borrower. . . . The cost of the third appraisal shall be divided evenly between FmHA . . . and the borrower.

Id. (emphasis added).

## ARGUMENT

### I. Carpenter's Breach of Contract Claim Must Be Dismissed for Lack of Privity

As the United States Court of Appeals for the Federal Circuit has observed,

> "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government. . . ." Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990). In other words, there must be privity of contract between the plaintiff and the United States.

Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998), cert. denied, 528 U.S. 820 (1999). Further, in contract cases the "government consents to be sued only by those with whom it has privity of contract." Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984). Therefore, where privity is lacking, the Court lacks jurisdiction to entertain the case. First Hartford Corporation Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999).

It is apparent from the complaint in this case that there was never any privity of contract between Carpenter and the Government. The complaint repeatedly alleges that Carpenter's deceased joint cotenant entered into the contracts in question. See Complaint ¶ 1 ("[p]laintiff's deceased joint cotenant . . . contracted with the United States"); ¶ 5 ("[p]laintiff's deceased joint cotenant entered into two FmHA contracts before December 21, 1979"); ¶ 7 ("[p]laintiff's deceased joint cotenant entered into one FmHA contract after December 21, 1979"); ¶ 9 ("[t]he plaintiff, Robbie Carpenter . . . , is the sole surviving joint cotenant of Ms. Maxine Carpenter,

who entered into three contracts for rental housing at the following properties"); ¶15 ("[p]laintiff's deceased joint cotenant agreed . . . to construct, rehabilitate, or improve three housing projects and to enter into Loan Agreements with FmHA'); ¶ 16 ("plaintiff's deceased joint cotenant executed, inter alia, a Promissory Note and Real Estate Mortgage for each project"); and ¶ 17 ("[by] signing th Loan Agreements and the Promissory Notes referenced therein, plaintiff's deceased joint cotenant promised . . . ").

The complaint does not allege that Carpenter herself executed any contract document, made any promise, or agreed to anything, either when the contracts in question were signed or thereafter. She does not allege that she entered into any novation agreement with the Government, or that she assumed any of the borrower's obligations under these contracts. She does not allege that she was a third party beneficiary of the contracts in question, nor does she allege any facts that could support characterizing her as such.

The only nexus between Carpenter and the contracts suggested by the complaint is her alleged status as a surviving cotenant of the properties affected by the contracts. The complaint does not allege, however, that she possessed any interest in these properties when her deceased joint cotenant entered into these contracts. Indeed, the complaint is quite cryptic about how and when Carpenter acquired her interest in these properties. The complaint states only that, at some unspecified time, "[p]laintiff's deceased joint cotenant . . . and plaintiff came to own the three properties as Joint Tenants with Rights of Survivorship." Complaint ¶ 1. Nothing in the complaint suggests that the Government was a party to, or was even aware of, any transactions by which Carpenter "came to own" the referenced properties as a joint tenant, much less that the

Government made any promises or incurred any obligations to Carpenter in connection with these transactions.

For the same reason, there is no basis for Carpenter's legal conclusion that the Government's alleged repudiation of the contracts "has deprived and will deprive plaintiff of her contractual right to terminate said contracts at any time at her option before the expiration date of their fifty (50)-year contract terms." Complaint ¶ 50. Whether or not the Government deprived Carpenter's deceased joint cotenant of a contractual right to terminate these contracts, there is no basis for concluding that Carpenter, a stranger to the contracts, possessed any contractual right to terminate them.

In sum, according to the allegations contained in the complaint, Carpenter is simply a stranger to the contracts in question, lacking privity of contract with the Government and lacking any rights under the contracts alleged to have been breached. Count One of the complaint, therefore, must be dismissed.

## II. The Alleged Governmental Actions Did Not Constitute a Taking of Carpenter's Property

### A. The Alleged Governmental Actions Did Not Violate Any Property Rights Belonging to Carpenter

In Count Two of the complaint, Carpenter alleges that "defendant's conduct constitutes a taking of plaintiffs' real and intangible property interests for public use and requires payment to plaintiffs of just compensation under the Fifth Amendment to the U.S. Constitution." ¶ 53. The complaint does not expressly identify the "intangible property interests" alleged to have been taken. To the extent that the intangible property interest purportedly taken was a right under the alleged contracts, the takings claim fails for the same reason as the contract claims: the complaint

does not indicate that Carpenter possessed any rights under these contracts. To the extent that the property purportedly taken was an interest in the housing projects described in the complaint, the takings claim fails because it is apparent, from the allegations contained in the complaint, that the property rights she acquired did not include the rights alleged to have been infringed by the Government actions of which she complains.

The Federal Circuit has stated:

> In evaluating a takings claim, we have developed a two-step approach. First, we determine whether the claimant possessed a cognizable property interest in the subject of the alleged taking for purposes of the Fifth Amendment, i.e., whether the claimant possessed a "stick in the bundle of property rights." Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (internal citation omitted). Second, once we have determined that such a property interest exists, we decide "whether the governmental action at issue constituted a taking of that 'stick.' " Id. (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995)).

Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004). The bundle of rights acquired by Carpenter when she obtained an ownership interest in the properties in question could not have included a right to utilize these properties in a manner inconsistent with the terms of the section 515 mortgages described in the complaint, because it is clear from the complaint that the properties were subject to these mortgages when she acquired her interest in them.

Carpenter does not allege that the Government imposed any use restrictions beyond those already contained in the contract documents. The complaint does alleges that "the legislation complained of herein . . . resulted in a taking of property" in that, [b]y requiring plaintiff's deceased joint cotenant and plaintiff to house low-income tenants and to accept new low-income tenants, the Government has (i) conscripted the above-described properties for public use;

(ii) physically invaded or authorized others to physically invade said properties; and (iii) deprived plaintiff's deceased joint cotenant and plaintiff of their distinct investment-backed expectations . . . ." Complaint ¶ 39. It is clear from the complaint, however, that the requirement to house low-income tenants was embodied in the contract between the Government and the borrower, and in the mortgages to which the properties were subject when Carpenter obtained her interest in the projects. This requirement was not imposed by the challenged legislation. The legislation addressed only the borrower's alleged prepayment right under the terms of the promissory note, not the use of the property. The legislation may have affected Carpenter's use of the real property by limiting the borrower's ability to terminate existing contractual restrictions upon the use of the projects, through prepayment of the loan. If this limitation violated any right, however, it was a contract right belonging to the borrower, not Carpenter.[4]

---

[4] Further, the reasoning of the Supreme Court in Franconia Associates v. United States, 536 U.S. 129 (2002) (which involved the same breach of contract and takings theories as in this case, except that the plaintiffs were parties to the contracts in question) confirms that plaintiffs' takings claims depend upon their breach of contract claims. In Franconia, the Supreme Court focused upon the breach of contract claims in addressing the statute of limitations issue, but reached the same conclusion with respect to the takings claims without any separate analysis. The Court observed:

> [W]e need not separately address petitioners' alternative theory of recovery based on the Takings Clause of the Fifth Amendment. The Federal Circuit's holding that takings relief was time barred hinged entirely on its conclusion that petitioners' contract claims accrued upon passage of ELIHPA. See 240 F.3d, at 1365-1366. Because that conclusion was incorrect, we hold, the Federal Circuit erred in dismissing petitioners' takings theory on grounds of untimeliness.

536 U.S. at 149. Implicit in the quoted statement is the assumption that the takings claim could not have accrued before the breach of contract claim; yet, this assumption could not have been

(continued...)

B. The Government Did Not Effect an Uncompensated Taking under The Penn Central Test

Even assuming that it is appropriate to blur the distinction between Carpenter and the borrower as the complaint does, and to treat Carpenter as if she were a borrower, the takings claim should nevertheless be rejected. The Supreme Court has identified several factors to be utilized in assessing whether Government regulatory action effects a taking under the Fifth Amendment. These factors include: (1) the extent to which the regulation has interfered with distinct investment-backed expectations; (2) the economic impact of the regulation upon the claimant; and (3) the character of the governmental action. Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124 (1978). As a matter of law, Carpenter cannot established a taking based upon these factors.

1. The Government's Actions Did Not Interfere with Reasonable Investment-backed Expectations

The absence of a reasonable investment-backed expectations concerning the allegedly-invaded property interest can itself be a sufficient basis for denying a takings claim. See California Housing Sec., Inc. v. United States, 959 F.2d 955, 958 (Fed. Cir. 1992) (dismissing takings claim of savings and loan institution because institution had "voluntarily subjected itself to an expansive statutory regulatory system," and, therefore, could not have developed a "historically rooted expectation of compensation" for seizure of institution pursuant to that regulatory scheme); accord Golden Pac. Bancorp v. United States, 15 F.3d 1066, 1073-74 (Fed.Cir.1994).

---

[4](...continued)
made if there were a basis for the takings claim independent of the contract claim. Here, too, the takings claim depends upon the contract claim, except here the contract claim does not belong to the plaintiff.

The complaint in this case does not allege that Carpenter's investment in the property in question was made prior to the enactment of ELIHPA and the related legislation of which she complains. Thus, she cannot contend that this investment was made with an expectation that she would be able to utilize the property free of the restrictions imposed by this legislation. See .M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995) ("in analyzing a governmental action that allegedly interferes with an owner's land use, there can be no compensable interference if such land use was not permitted at the time the owner took title to the property").

Further, the challenged Government actions could not be characterized as interfering with investment-backed expectations even of borrowers whose investment preceded this legislation. In Parkridge Investors, Ltd. v. Farmers Home Administration, 13 F.3d 1192 (8th Cir. 1994), the Eighth Circuit held that the ELIHPA restrictions upon prepayment of section 515 loans did not constitute a taking of the plaintiff's property under the Fifth Amendment. Id. at 1198-99. Assessing the borrower's investment-backed expectations, the court reasoned that "it was foreseeable that the government might impair the partnership's contractual options in order to prevent the program's purposes from being foiled. Therefore, we cannot agree that Parkridge's expectation of a continued, unrestricted right to prepay was 'reasonable.'" Id. Accordingly, the Court concluded, no compensable taking had occurred. The same is true here.[5]

---

[5] In Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003), the Federal Circuit faulted the trial court for relying upon Parkridge to reject a takings claim involving private loans insured by the Department of Housing and Urban Development ("HUD") . The Federal Circuit distinguished Parkridge, upon the ground, among others, that "in Parkridge, the plaintiff's mortgage loan was directly from the FmHA, not from a private lender under a separate contract." 331 F.3d at 1351. This case – like Parkridge and unlike Cienega Gardens – involves direct loans from FmHA. With respect to the Government's argument that there could be no investment-

(continued...)

2. The Economic Impact of the Government's Action Was Not Sufficient to Constitute a Taking

The economic impact of which Carpenter complains consists of the effects of being unable to leave the section 515 program. Complaint ¶¶ 46-48. The challenged legislation, however, does not force borrowers to remain in the program. First, borrowers are able to free themselves of the program's restrictions by offering their properties for sale to a public or nonprofit organization, for fair market value. 42 U.S.C. § 1472(c)(5)(A)(i); 7 C.F.R. § 1965.216. Second, where housing opportunities for minorities would not be materially affected by prepayment, borrowers have the option of prepaying as long as they agree not to raise rents to force out current tenants. 42 U.S.C. § 1472(c)(5)(G)(ii)(I); 7 C.F.R. § 1965.215(c)(1)(ii). Third, whenever it can be established that housing opportunities for minorities would not be materially affected by prepayment and that the tenants either would not be displaced by prepayment or there is an adequate supply of affordable housing in the market area available to displaced tenants, borrowers can prepay without restrictions and without any prior offer to sell to a public or nonprofit organization. 42 U.S.C. § 1472(c)(5)(G)(ii)(II); 7 C.F.R. § 1965.215(c)(1)(iii).

Finally, the fact that borrowers have always had the option of selling their properties to a public or nonprofit entity for market value in itself belies the claimed economic impact. Pursuant to 7 C.F.R. § 1965.216, such a sale must be for "fair market value of the project as unsubsidized conventional housing," as determined based upon appraisal by two appraisers, one chosen by the owner and one by the Government (and a third appraiser chosen by the first two in

[5](...continued)
backed expectations of being free from the challenged restrictions in view of the highly regulated nature of the field involved, the Federal Circuit noted that "the field of private mortgage lending is one which cannot be considered highly regulated." Id. at n.45. This case, however, involves direct Government lending, not private mortgage lending.

case of significant disagreement). If borrowers can sell their properties for their full market value under the ELIHPA restrictions, then the restrictions have not decreased the value of the property at all and have had no adverse economic impact upon the borrowers. And, if borrowers do not succeed in the attempt to find a qualified purchaser at fair market value, then they will be permitted to prepay without restrictions, and the value of the property at that point will be the same as it would have been if there had never been any restrictions. Thus, the Government's actions cannot have caused any significant decrease in the value of borrowers' property.

3. The Character of the Government's Actions Does Not Indicate a Taking

In distinguishing the ELIHPA prepayment restrictions relating to FmHA loans under section 515 – which were held not to constitute a taking in Parkridge – from those pertaining to HUD-insured loans involved in Cienega Gardens, the Federal Circuit stated:

> Under ELIHPA . . . , the FmHA was not prohibited from accepting prepayment; rather the FmHA could "accept prepayment only at the end of an intricate, six-month-long (or longer) procedure," and the party desiring to prepay could be forced to sell the property instead if a willing non-profit or public agency offered to buy the property at market value. Id. While this six-month delay undoubtedly caused some inconvenience to the Parkridge plaintiff, the economic effect was minor and short-term. Here, the effect was major and the deferral was for up to twenty years. . . . Moreover, the possibility of being forced to sell would actually offer ample compensation, rather than causing injury as the plaintiff suggested. . . .

331 F. 3d at 1351 (emphasis added), quoting Parkridge, 13 F.3d at 1195.

Further, the Government actions involved here cannot be characterized as "forcing some owners to keep accepting below-market rents, " Cienega Gardens, 331 F.3d at 1319, because all owners can free themselves of this burden by offering to sell their properties to a nonprofit organization or public agency at a fair market value, pursuant to 42 U.S.C. § 1472(c)(5)(A)(i).

Such a course would enable the owner to either to obtain the value of the property appraised as a conventional property, or, in the absence of a purchaser, to prepay with no restrictions. If the sale were consummated, the owner could, if he wished, reinvest the proceeds in a conventional housing project, at which market rents could be charged. If there were no offer to purchase, the owner would be free to charge market rents at the same property, after prepaying the loan.

Finally, the danger sought to be averted by the challenged prepayment restrictions is the danger of displacement of low-income tenants residing in subsidized housing. This danger arose because in the section 515 program sought to prepay their loans in order to raise rents. The limited regulation of the prepayment process under ELIHPA was narrowly tailored to protect tenants whose housing was endangered by the prospect of prepayment, while also protecting the economic interests of borrowers. Under these circumstances, the character of this legislation does not support a takings claim.

In sum, borrowers have only been prevented from converting section 515 housing to conventional, market-rent housing while the housing is occupied by tenants who cannot afford to pay market rents and there is an inadequate supply of affordable housing in the market area available to displaced tenants or housing opportunities for minorities would be materially affected, and there is a possibility of avoiding these problems at no cost to the borrowers through a sale of the property at fair market value to a public or nonprofit organization that would preserve the availability of the property to low-income tenants.

## CONCLUSION

For the foregoing reasons, Carpenter's complaint should be dismissed with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

**s/David M. Cohen**
DAVID M. COHEN
Director

**Filed electronically**

**s/Shalom Brilliant**
SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 305-7561
Facsimile: (202) 305-7643

Attorneys for Defendant

February 7, 2005