**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

ROBERTA R. CARPENTER,
SURVIVING JOINT
COTENANT

Plaintiff,

**File No. 04-01740**
**Judge George W. Miller**

v.

THE UNITED STATES

Defendant.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

Jeff H. Eckland
Mark J. Blando, Of Counsel
ECKLAND & BLANDO LLP
700 Lumber Exchange
10 South Fifth Street
Minneapolis, Minnesota 55402
Telephone: 612-305-4444
Facsimile: 612-305-4439

Dated: April 21, 2005

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........ ii

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS........ 1

BACKGROUND ........ 1

A. Overview of Plaintiff's Claims ........ 1

B. Facts Regarding Plaintiff's Ownership Interest in the Properties ........ 2

ARGUMENT ........ 4

I. Plaintiff Stands In Privity With The Government Because She Assumed The Rights And Responsibilities Of The Original Owner By Operation Of Law ........ 4

A. Plaintiff Possesses Legal Title to the Properties and Thus is the Successor-in-Interest and in Privity with the Original Covenantees ........ 4

B. The Rights and Obligations Set Forth in the Contract Documents Run with the Land, Which Also Creates Privity Between Plaintiff and the Government ........ 7

II. Plaintiff Suffered A Compensable Taking of Her Property........ 10

A. Plaintiff Holds a Protected Real Property Interest Under State Law........ 10

B. The Government's Regulations, As Applied, Effected A Taking Of Plaintiff's Properties ........ 12

1. *Plaintiff held a reasonable investment-backed expectation that she would be able to prepay the mortgages and leave the Section 515 program*........ 12

2. *The economic impact of plaintiff's inability to prepay without restrictions and convert to market rate rents is severe*........ 18

3. *In forcing plaintiff to continue the low-income use of her properties, the government unfairly imposed on plaintiff a burden that should be borne by the public generally* ........ 20

III. Plaintiff's Claims Cannot Be Dismissed at this Stage of the Litigation........ 21

CONCLUSION ........ 22

# APPENDIX TABLE OF CONTENTS

Declaration of Roberta R. Carpenter and accompanying exhibits:

Exhibit

Application for Inheritance Tax Assessment by M. Carpenter (February 1993) .........A

Indenture for Project I & II from M. Carpenter to joint tenants M. Carpenter and Roberta Carpenter (August 24, 2000) ................................B

Indenture for Sage from M. Carpenter to joint tenants M. Carpenter and Roberta Carpenter (August 24, 2000) ......................................................C

Statement of Acknowledgment regarding operation of right of survivorship (December 12, 2000) ...........................................................................................D

Promissory note for Project I (March 10, 1976) ..........................................................E

Mortgage for Project I (March 10, 1976)......................................................................F

Promissory note for Project II (December 18, 1980)....................................................G

Mortgage for Project II (December 18, 1980) ..............................................................H

Agreement correcting mortgage for Project I & II (December 31, 1980) ....................I

Promissory note for Sage (October 7, 1975) ................................................................J

Mortgage for Sage (October 7, 1975)...........................................................................K

Management Agreement for Sage (March 15, 2004) ..................................................L

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Agins v. Tiburon*, 447 U.S. 255 (1980) .....19

*Armstrong v. United States*, 364 U.S. 40 (1960) .....19

*Augustine v. United States*, 704 F.2d 1074 (9th Cir. 1983) .....20

*Branch ex. Rel. Maine Nat'l Bank v. United States*, 69 F.3d 1571 (Fed. Cir. 1995) .....14

*Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995) .....12, 13, 16

*Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997) .....16

*Crawford v. United States*, 796 F.2d 924 (7th Cir. 1986) .....20

*Duquesne Light Co. v. Barash*, 488 U.S. 299 (1989) .....18

*Erickson Air Crane Co. v. United States*, 731 F.2d 810 (Fed. Cir. 1984) .....4

*First Fed. S&L Ass'n of Rochester v. United States*, 58 Fed. Cl. 139 (1992) .....21

*Florida Rock Indus. v. United States*, 18 F.3d 1560 (Fed. Cir. 1994) .....18, 19, 20

*Florida Rock Indus. v. United States*, 45 Fed. Cl. 21 (1999) .....18

*FPC v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) .....18

*Golden Pac. Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994) .....14

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir.1991) .....11

*Hughes v. United States*, 58 Fed. Cl. 291 (2003) .....4

*Hodel v. Irving*, 481 U.S. 704 (1987) .....11

*In re Etter*, 756 F.2d 852 (Fed. Cir. 1985) .....11

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) .....11

*Kennedy v. United States*, 19 Cl. Ct. 69 (1989) .....4, 5, 6

*Kingsbury v. United States*, 563 F.2d 1019 (Ct. Cl. 1977) ........................................6

*Kolovitz v. United States*, 1995 U.S. Dist. LEXIS 912 (N.D.Ill. 1995).....................20

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)...................10, 11, 17

*Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994)................15

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)............................10, 19

*Nat'l Austl. Bank v. United States*, 54 Fed. Cl. 238 (2002) ......................................6

*Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987) ...................................11, 19

*NRG Co. v. United States*, 24 Cl. Ct. 51 (1991) .......................................................14

*Osborn v. United States*, 918 F.2d 724 (8th Cir. 1990) ............................................20

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)......................................................10, 20

*Parkridge Investors Ltd. Partnership v. Farmers Home Administration*,
13 F.3d 1192 (8th Cir. 1994) ..................................................................12

*Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978)..............................10, 19, 20

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)...........................................19

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ................................................13,14,16,17

*Skip Kerchdorfer v. United States*, 6 F.3d 1573 (Fed. Cir. 1993).............................11

*Standard Mfg. Co. v. United States*, 42 Fed. Cl. 748 (1999) .....................................6

*Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002).........................................................................20

*Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004) ..........................................10

*United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990) ..................13, 14, 16

*United States v. General Motors Corp.*, 323 U.S. 373 (1945)..................................11

*Walcek v. United States*, 44 Fed. Cl. 462, 466 n.5 (1999) ........................................18

*Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155 (1980) ............................10, 11, 17

*Whitney Benefits, Inc. v. United States*, 752 F.2d 1554 (Fed. Cir. 1985) .................17

**State Cases**

*Baker v. Berger*, 873 P.2d 940 (Mont. 1994)...........................................................9

*Bordas v. Virginia City Ranches Assoc.*, 102 P.3d 1219 (Mont. 2004).....................7

*Haggerty v. Gallatin County*, 717 P.2d 550 (Mont. 1986) ......................................8

*Hampton v. Lewis & Clark County*, 23 P.3d 908 (Mont. 2001) ...............................8

*In re Estate of Sander*, 806 P.2d 545 (Mont. 1991)..................................................5

*Reichert v. Weeden*, 618 P.2d 1216 (1980)..............................................................8, 9

**Statutes and Regulations**

Housing and Community Development Act of 1980, Pub. L. No. 96-399,
§ 514, 94 Stat. 1671 (1980).....................................................................15

7 C.F.R. § 1822.95(c) (1978).......................................................................15

7 C.F.R. § 1965.90(c) (1983).......................................................................15

Mont. Code Ann. § 27-1-421 .......................................................................9

Mont. Code Ann. § 70-1-307 .......................................................................5

Mont. Code Ann. § 70-17-202 .....................................................................7

Mont. Code Ann. § 70-17-203(1) .................................................................7, 8, 9

Mont. Code Ann. § 72-3-604 .......................................................................21

**Treatises, Books and Articles**

2-5 NICHOLS ON EMINENT DOMAIN § 5.01(5) (2000)............................................11

5A Wright & Miller § 1350 .........................................................................20

A. Brownstein, *Constitutional Wish Granting and The Property Rights Genie*, 13 Const. Comm. 7, 43 n.112 (Spring 1996) ....................................................14, 15

John E. Cribbet & Corwin W. Johnson, *Principles of the Law of Property* 106 (3rd ed. 1989)....................................................................................5

Robert G. Natelson, *Running With the Land in Montana*, 51 Mont. L. Rev. 17 (*Winter* 1990).........................................................................................4, 8

ROBERTA R. CARPENTER,
SURVIVING JOINT
COTENANT

Plaintiff,

**File No. 04-01740**
**Judge George W. Miller**

v.

THE UNITED STATES

Defendant.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff hereby submits her opposition to defendant's motion to dismiss. In its motion, defendant seeks to dismiss plaintiff's contract and takings claims primarily on the grounds that, according to defendant, plaintiff lacks a sufficient interest in the properties to assert her claims against the government. However, there is no basis for dismissing plaintiff's contract claims because plaintiff is the successor-in-interest to the contracts and the real covenants applicable to the properties at issue. Further, by demonstrating her legal ownership of the properties, plaintiff has a demonstrable property interest under the laws of Montana and may assert a taking claim against the Government. Additionally, plaintiff's claims require a factual inquiry which makes a motion to dismiss premature and inappropriate. For these reasons, defendant's motion should be denied in its entirety and plaintiff's claims should proceed to discovery and a trial on the merits. In alternative, if the Court for some reason decides to dismiss some or all of plaintiff's claims, plaintiff requests leave to amend the complaint in order to substitute parties.

## BACKGROUND

### A. Overview of Plaintiff's Claims

Plaintiff is the fee simple owner of three properties that are used as affordable housing in rural areas of the United States. The housing was financed by mortgages issued by the Farmer's Home Administration ("FmHA"), an agency of the Department of Agriculture, pursuant to Section 515 of the Housing Act of 1949 (the "Section 515 program"). The relevant contracts and contemporaneous regulations granted the owner the option to prepay the government mortgage prior to the expiration of their fifty-year mortgage term, at which time the property could be taken out of the Section 515 program and converted to a market-rent property. So long as a property remains in the Section 515 program, however, the owner can earn only a marginal annual return representing a small percentage of the initial down payment made. As a result, the owner of the subject properties intended at all relevant times to prepay the mortgages as soon as circumstances would allow in order to realize the full economic potential of the properties.

In 1988 and 1992, however, Congress passed two statutes that impose severe restrictions on Section 515 owners' previously unfetter right to prepay. Thus, the statutes repudiate the owners' rights to prepay and exit the program at any time at their option. The new prepayment regime created by these statutes allows an owner to prepay without any restrictions only where the agency determines that prepayment would not have any adverse impact on minorities and either: (1) tenants would not be displaced as a result of the loss of the housing, or (2) sufficient alternative affordable housing exists within the community to accommodate any tenants who are displaced. If the agency cannot make these determinations, an owner desiring to leave the program must either agree to remain in the program for an extended period of time or risk losing its property through a forced sale to a public or non-profit entity.

In November 1999 and November 2000, the owner of the properties submitted written requests to the agency seeking to prepay the mortgages without restrictions. Complaint ¶ 43. However, the Agency denied the requests based on the restrictions imposed by the 1988 and 1992 legislation, resulting in a breach of the contracts. Id. ¶ 44-48, 50. As a result, plaintiff remains trapped in the Section 515 program and subject to its severe income restrictions against her will. Plaintiff therefore brought suit, alleging counts for breach of contract and a Fifth Amendment taking of property. Plaintiff will establish at trial the damages that she has suffered, which represent the difference between her meager returns within the program and the returns the properties would have earned on the conventional housing market had she been permitted to prepay in accordance with the terms of the parties' contracts.

**B. Facts Regarding Plaintiff's Ownership Interest in the Properties**

Plaintiff, Roberta R. Carpenter, is the daughter of Harlan E. Carpenter and Maxine Carpenter. Declaration of Roberta R. Carpenter ("Carp. Decl.") ¶ 2. Harlan Carpenter and Maxine Carpenter executed the closing documents and built the three properties at issue in this case, known as Project I Apartments, Project II Apartments, and Sage Apartments, in the late 1970s and early 1980s. Carp. Decl ¶ 2. The closing documents signed by Harlan and Maxine Carpenter state that the covenants contained therein are made by the government and the borrower, "for himself, his heirs, executors, administrators, successors, and assigns." Carp. Decl. Ex. F, H, K. Further, certain of the contracts state that "[t]he borrower and any successors in interest agree to use the housing for the purpose of housing people eligible for occupancy as provided in Section (514 of 515) of Title V of the Housing Act of 1949" for a period of twenty years. Carp. Decl., Ex. I (mortgage referencing Projects I & II).

Mr. Harlan Carpenter operated and maintained the properties that he jointly held with his wife, until his death in February 1991. Carp. Decl ¶ 2. Upon Mr. Carpenter's death, the property passed to his wife, Mrs. Maxine Carpenter, who was his joint tenant (Carp. Decl. Ex. H) and also a signatory to the original closing documents. Carp. Decl ¶ 3. Mrs. Maxine Carpenter remained the sole owner from the death of her husband until August 2000. Carp. Decl ¶ 3. At that time, Mrs. Maxine Carpenter learned that her illness was terminal. Carp. Decl ¶ 4. As a result, she took immediate action to ensure that title to the property – along with all rights and obligations related to the property – would pass directly to her daughter by operation of law upon her death.

Thus, after consulting with an attorney, Mrs. Maxine Carpenter deeded the title of the three properties to herself (Maxine) and Roberta Carpenter as joint tenants with the right of survivorship. Carp. Decl ¶ 4. The deeds were duly recorded in compliance with Montana law on August 24, 2000. Carp. Decl ¶ 4. The properties were then held by both Maxine Carpenter and Roberta Carpenter as joint tenants until Maxine Carpenter passed away on September 1, 2000. Carp. Decl ¶ 5. At that time, according to the terms of the deed and by operation of the right of survivorship under Montana law,[1] Roberta Carpenter assumed title to the three properties at issue in this case. Carp. Decl. ¶ 5, Ex. D.

Roberta Carpenter currently performs all of the duties with respect to the properties that an owner would perform while involved in the Section 515 program. Carp. Decl ¶ 6. She is authorized by the Agency to access the reserve accounts for the properties at issue here. *Id.* She is a signatory on all of the checking accounts, and is authorized by the Agency to sign for the

[1] Montana property law evolved from the Field Codes, which were originally rejected by the State of New York before being adopted by the territory of Montana. Robert G. Natelson, *Running With the Land in Montana*, 51 Mont. L. Rev. 17, 18 (Winter 1990).

operations accounts. *Id.* Ms. Carpenter also signs the rental assistance agreements that pertain to the properties. *Id.* Finally, she is responsible for the management of the properties, which she has contracted to Joyce Johnson through Management Agreements that are reviewed and approved by the agency in writing. *Id*.

## ARGUMENT

### I. Plaintiff Stands In Privity With The Government Because She Assumed The Rights And Responsibilities Of The Original Owner By Operation Of Law.

#### A. Plaintiff Possesses Legal Title to the Properties and Thus is the Successor-in-Interest and in Privity with the Original Covenantees.

A plaintiff must have privity of contract in order to have standing to enforce a contract against the government. *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984); *Hughes v. United States*, 58 Fed. Cl. 291, 307 (2003). If a person was not a signatory on the original contract, then that person cannot "assert the requisite privity of contract with the Government without showing something more." *Kennedy v. United States*, 19 Cl. Ct. 69, 72 (1989). In *Kennedy*, the court applied "principles of federal contract law" to a case involving the redemption of a Treasury note, *i.e*. a contract between the purchaser of the note and the federal government. *Id.* at 72. The court held that "[p]rivity of contract between the plaintiff and the Government can only arise if the plaintiff can establish title to the note, thereby entitling her to step in the shoes of the original purchaser and assume all the obligations of the contract." *Id.* at 72 (dismissing contract claim because plaintiff did not perfect title to property according to state law).

Thus, establishing a chain of legal title, which brings about corresponding rights and obligations, will establish privity between the parties. "In Montana, a joint interest in property is created when the transfer of the property expressly declares the interest to be a joint tenancy." *In*

*re Estate of Sander*, 806 P.2d 545, 546 (Mont. 1991); Mont. Code Ann. § 70-1-307 ("A joint interest is one owned by several persons in equal shares by a title created by a single will or transfer, when expressly declared in the will or transfer to be a joint tenancy or when granted or devised to executors or trustees as joint tenants.").

Roberta Carpenter became a joint tenant with Maxine Carpenter, who was the last remaining original signatory to the promissory notes and mortgage agreements regarding the properties at issue here. Carp. Decl. ¶ 4. Upon the death of Maxine Carpenter, Roberta Carpenter became the sole owner of the three properties due to the right of survivorship. Ex. D (filing with state acknowledging the operation of the right of survivorship); *see also* John E. Cribbet & Corwin W. Johnson, *Principles of the Law of Property* 106 (3rd ed. 1989) ("The outstanding feature of the joint tenancy is the right to survivorship which is inherent in it."). Thus, Roberta Carpenter is a successor in interest to the contractual obligations created by Harlan and Maxine Carpenter in the period from 1975 to 1980. *Id.*; Carp. Decl. ¶ 7. As a result, she holds full fee simple title to the properties, "thereby entitling her to step in the shoes of the original purchaser and assume all the obligations of the contract," which in turn establishes privity of contract between plaintiff and the government. *See Kennedy*, 19 Cl. Ct. at 72.[2]

---

[2] Any argument by defendant that the transfer of the property to plaintiff from her parents was ineffective or contrary to the terms of the contract must fail under the analysis set forth above, and at best raises disputed fact issues as to whether the agency approved of the transfer. In addition, the Anti-Assignment Act does not serve as a defense because this situation is "analogous to those in which a claim is transferred to a different corporation by virtue of a merger or a sale, an event [by operation of law] which does not trigger the Anti-Assignment Act." *National Austl. Bank v. United States*, 54 Fed. Cl. 238, 239 (2002) (holding that parent corporation retained claims of wholly owned subsidiary after subsidiary was sold); *see also Standard Mfg. Co. v. United States*, 42 Fed. Cl. 748, 779 (1999). The ownership interest was transferred to Roberta Carpenter pursuant to Montana state law, which grants a surviving joint tenant the full property interest held by the deceased co-tenant.

Additionally, the basic objectives for the Anti-Assignment Act are not implicated in this case; specifically, the government should not be concerned that a person might accumulate

The fact that Roberta Carpenter stands in contractual privity with the government as a matter of law is confirmed by the facts regarding her dealings with the agency with respect to the operation of the properties. Ms. Carpenter maintains and signs for all of the accounts relating to the properties. Ms. Carpenter also signs the rental assistance agreements relating to the properties. She is responsible for the management of the properties, which she has contracted to a third party through Management Agreements that are reviewed and approved by the agency in writing. Thus, plaintiff's ownership interest in the properties is a steady continuation of the ownership interests defined by the original contracts. By the same token, the agency has acquiesced in the transfer of the property to plaintiff by operation of law by continuing to deal with her on all matters related to the operation and management of the properties. Indeed, if plaintiff does not stand in privity of contract with the government, as defendant contends, then it is unclear how the government can force plaintiff to remain in the Section 515 program against her desire to prepay and be freed of the program's restrictions.

**B. The Rights and Obligations Set Forth in the Contract Documents Run with the Land, Which Also Creates Privity Between Plaintiff and the Government**

Under Montana law, real covenants that run with the land are exclusively defined by statute. Mont. Code Ann. § 70-17-202. The relevant statute reads, "[e]very covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part then in existence, runs with the land." Mont. Code Ann. § 70-17-203(1). Thus, based on the statute, Montana law incorporates elements of (1) an intent to bind the property and

---

claims and exert undue influence, or that the government will have to make multiple payments, of that the government's defenses and counter-claims are limited by the change in ownership. *See Kingsbury v. United States*, 563 F.2d 1019, 1024 (Ct. Cl. 1977) (citing *United States v. Shannon*, 342 U.S. 288, 291-92). In regards to the impossibility of multiple payments, the original executors of the contract are now deceased and the plaintiff is their heir as well as the surviving joint co-tenant.

assigns, (2) proper subject matter (*i.e.,* a covenant "made for the direct benefit of the property"), (3) horizontal privity (*i.e.*, a "covenant contained in a grant of an estate in real property"), and (4) vertical privity (*i.e.*, a covenant made "expressly for his assigns or the assigns of the covenatee"). *Id*. Once validated, "[r]estrictive covenants are construed under the same rules of construction as other contracts: courts read declarations of covenants on their four corners as a whole, and terms are construed in their ordinary or popular sense." *Bordas v. Virginia City Ranches Assoc.*, 102 P.3d 1219, 1223 (Mont. 2004) (citation omitted). Here, plaintiff has satisfied all of the statutory requirements for establishing that the rights and obligations of the original contracts "run with the land" and therefore can be asserted by subsequent owners.

First, the statute requires that the covenants reflect an intent to bind the property and assignees. Mont. Code Ann. § 70-17-203(1). Here, the covenants between plaintiff's predecessors-in-interest and FmHA make clear that they were intended to bind subsequent parties, by unambiguously stating, prior to setting forth the respective rights and obligations of the parties, that "BORROWER for himself, his heirs, executors, administrators, successors and assigns… COVENANTS AND AGREES as follows…"). Carp. Decl., Exs. E, G, J (emphasis in original); *see also* Carp. Decl. Ex. H (mortgage referencing Projects I & II) ("The borrower and any successors in interest agree to use the housing for the purpose of housing people eligible for occupancy as provided in Section (514 of 515) of Title V of the Housing Act of 1949…").

Second, the statute requires that the covenants be "made for the direct benefit of the property" which incorporates the common element that a covenant touch and concern the land, as well benefit the property. Mont. Code Ann. § 70-17-203(1). Affirmative covenants, which require affirmative acts to comply with the covenant, "may burden conveyed land only when they also benefit conveyed land." Robert G. Natelson, *Running With the Land in Montana*, 51

Mont. L. Rev. 17, 70 (Winter 1990); *see also Hampton v. Lewis & Clark County*, 23 P.3d 908, 912-913 (Mont. 2001) (accepting Netelson's law review article as an accurate summary of the current state of Montana case law). The provisions of the contract documents at issue directly relate to and benefit the property by defining the parties rights and obligations with respect to the property, including (1) the issuance of a government loan to construct housing in rural areas, and (2) the right of the owner to prepay the mortgage and rent the property as a conventional apartment building. Carp. Decl. Exs. E, G, I; *see also Haggerty v. Gallatin County*, 717 P.2d 550 (Mont. 1986) (upholding restrictions barring commercial use of real property).

Third, the Montana statute requires that the covenants be "contained in a grant of an estate in real property." Mont. Code Ann. § 70-17-203(1). At the time of enactment of the Montana Field Code, the drafters arguably intended for the horizontal privity requirement to be satisfied by covenants included in documents that granted property interests or were executed in conjunction with the conveyance. *See* Natelson, 51 Mont. L. Rev. at 50. However, the Montana Supreme Court has subsequently eased the requirements for establishing a "grant" of a property interest. *See Reichert v. Weeden*, 618 P.2d 1216 (1980). In *Reichert*, the court held that a covenant was enough of a "grant" where a tavern owner and neighbor agreed that the tavern would cease liquor operations a decade later, and that the covenant would "run with the land." *Id*. The parties to the covenant already held their property interests, but the promise itself was deemed sufficient to constitute a "grant." *Id*. Here, the covenants were contained in the closing documents for each property. *See*, *e.g.*, Ex. E, F. The terms of those contracts, as set forth above, satisfy both the older strict standard and the modern court-defined standard for establishing a "grant." *Id.*

Fourth, the Montana statute requires that the covenants be made "expressly for his assigns or the assigns of the covenatee." Mont. Code Ann. § 70-17-203(1). Montana law also provides that:

> Whenever an obligation in respect to real property would be specifically enforced against a particular person, it may be in like manner enforced against any other person claiming under him by a title created subsequently to the obligation.

Mont. Code Ann. § 27-1-421; *Baker v. Berger*, 873 P.2d 940, 944 (Mont. 1994) (holding representative of deceased cotenant's estate was bound by earlier property agreement). As explained above, the contract documents clearly express the parties' intent to bind subsequent owners and assigness. Thus, plaintiff is in vertical privity with the original owner by virtue of succeeding to their property interests, which effectively puts plaintiff "in their shoes" with the same rights and responsibilities regarding the properties. As the sole surviving joint tenant, plaintiff assumed complete ownership of the properties upon the death of Maxine Carpenter by operation of the right of survivorship under Montana law.

Finally, there can be no dispute that plaintiff had notice of the covenants contained in the original documents, both before assuming a joint tenancy with Maxine Carpenter and before the operation of the right of survivorship which left plaintiff the sole owner of the properties. As a result of the above, the covenants regarding the properties at issue meet the statutory definition of real covenants that are enforceable in Montana. Accordingly, because these covenants are binding upon plaintiff, plaintiff is correctly deemed a successor in interest to the original covenantees and thus stands in privity of contract with the defendant.

## II. Plaintiff Suffered A Compensable Taking of Her Property.

The Supreme Court has emphasized time and again that the determination of whether regulations effect a taking of property "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992); *see also Tahoe Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002); *Lucas*, 505 U.S. at 1015; *Pennsylvania Coal Co.*, 260 U.S. at 413. In accordance with this precedent, the Supreme Court held in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 119 S.Ct. 1624, 1644-45 (1999), that various findings necessary to determine whether government regulation effects a taking are questions for the finder of fact. *See also Conoco Inc. v. United States*, 35 Fed. Cl. 309, 337 (1996) (refusing to dismiss plaintiffs' taking claims on summary judgment, even where the plaintiffs failed to offer any response whatsoever to the government's motion on that issue). Thus, plaintiff's taking claims, by their core nature, involve intensive factual inquiries, rendering disposition on a motion to dismiss inappropriate.

### A. Plaintiff Holds a Protected Real Property Interest Under State Law.

It is well-established that the Fifth Amendment protects interests in real property. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1016 n.7 (1992) (holding that "the 'interest in land' that *Lucas* has pleaded (a fee simple interest) is an estate with a rich tradition of protection at common law); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (property interest in apartment building on which cable wires were installed); *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978) (property interest in air space rights above transportation terminal needed for development of high rise building).

Significantly, the Supreme Court has made clear that a takings claim "is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction." *Palazzolo v. Rhode Island*, 533 U.S. 606, 630 (2001) (holding that transfer of property after alleged taking occurred does not defeat a taking claim); *see also Toews v. United States*, 376 F.3d 1371, 1373 (Fed. Cir. 2004) (holding that successors-in-interest are permitted to bring takings claims where relevant agreement expressly states that it binds "heirs executors administrators and assigns"). Thus, the Supreme Court's decision wholly undermines defendant's assertion that plaintiff's taking claim must be dismissed simply because she was not one of the original owners of the property when the deals were initiated in the late 1970s.

In addition, plaintiff's real property interest exists wholly independent of their contracts with the government. As the Supreme Court held in *Webb's Fabulous Pharmacies v. Beckwith*, property interests protected by the Fifth Amendment are not created by federal law, but are "created and their dimensions a defined by existing rules or understandings that stem from an independent source such as state law." 449 U.S. 155, 161 (1980) (citation omitted); *accord Skip Kerchdorfer v. United States*, 6 F.3d 1573, 1581 (Fed. Cir. 1993) (property interests "generally arise from the state law"). Here, plaintiff's property interests thus encompass all of the state-created property rights that inhere in the fee simple ownership of real estate, including the right to economically productive use and enjoyment of the property, the right to exclusive possession, and the rights to transfer, devise, and dispose of property. *See generally* 2-5 NICHOLS ON EMINENT DOMAIN § 5.01(5) (2000); *see also Hodel v. Irving*, 481 U.S. 704, 715-16 (1987); *United States v. General Motors Corp*., 323 U.S. 373, 377-78 (1945) ("property" under the Fifth Amendment encompasses the right to "possess, use and dispose of it"). Indeed, the right to

exclusive possession alone is so well-rooted that a taking of that right alone gives rise to a takings liability.[3]

Plaintiff has established ownership of the three properties, in an unbroken line of possession from the original signatories to herself. *See* Part I, *supra*. By unilaterally extending restrictions on the permissible use of plaintiff's properties and prohibiting her from prepaying the mortgages without restrictions, the government prevented plaintiff from being able to raise the rents or convert the properties to conventional uses. As a result, plaintiff is unable to accept tenants at market rate rent or exclude the government-approved tenants. In essence, the government dictated to plaintiff how her properties must be used, who will live in her buildings, and what rents her government-mandated tenants will pay. Under *Palazzolo*, plaintiff is entitled to seek compensation for the government's interference with her state law property interests.

### B. The Government's Regulations, As Applied, Effected A Taking Of Plaintiff's Properties.

#### *1. Plaintiff held a reasonable investment-backed expectation that she would be able to prepay the mortgages and leave the Section 515 program.*

This Court has already rejected the argument that a property owner's participation in a regulatory program intended to provide low-income housing renders its investment-backed expectations unreasonable as a matter of law. In *Cienega Gardens*, 33 Fed. Cl. 196, owners of

---

[3] The Supreme Court has described the right to exclude others as "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) (holding that the right to exclusive possession, "so universally held to be a fundamental element of the property right, falls within [the] category of interests that the government cannot take without compensation"); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987); *Loretto*, 458 U.S. at 435 (noting that the right to exclude "has traditionally been considered one of the most treasured strands in the owner's bundle of property rights"); In re Etter, 756 F.2d 852, 859 (Fed. Cir. 1985) holding that the "essence of all property is the right to exclude"); *Hendler v. United States*, 952 F.2d 1364, 1374-75 (Fed. Cir.1991) (describing "the right to sole and exclusive possession – the right to exclude strangers, or for that matter friends, but especially the Government" as "fundamental to our theory of social organization").

low-income housing projects alleged a taking based on provisions of the 1988 Legislation and LIHPRHA that required them to obtain permission from HUD before prepaying their mortgages. The court dismissed the government's contention that the plaintiffs "operate in a highly regulated field, and, therefore, they should have expected that the government might change its mind about allowing plaintiffs to exercise the rights set forth in their deed of trust notes." *Id.* at 222. Expressly disagreeing with the Eighth Circuit's decision in *Parkridge Investors Ltd. Partnership v. Farmers Home Administration*, 13 F.3d 1192 (8th Cir. 1994) the *Cienega Gardens* court reasoned as follows:

> Plaintiffs' prepayment expectations were based on express language contained in their deed of trust notes and authorized by HUD. The prepayment clauses were consistent, moreover, with contemporaneous HUD regulations, and those regulations remained in force for the better part of the first 20 years of plaintiffs' mortgages. On that basis, the court cannot conclude that plaintiffs' expectations were "unreasonable."

33 Fed. Cl. at 222. Thus, this Court held that the owners' expectations that they would be permitted to prepay their mortgages, in accordance with assurances made by the government through the mortgage notes and applicable regulations, were reasonable.

The holding in *Cienega Gardens* accords with precedent from the Supreme Court and Federal Circuit. In *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), a pesticide manufacturer brought a taking claim based on the EPA's disclosure of certain trade secret information submitted under the Federal Insecticide, Fungicide, and Rodenticide Act. The Court found a taking with respect to protected information submitted during the time period when the statute contained "explicit assurances" that the confidentiality of such information would be maintained. *Id.* at 1011 ("This explicit governmental guarantee formed the basis of a reasonable investment-backed expectation."). Based on the government's assurances, the Court deemed the company's

expectation of confidentiality to be reasonable, notwithstanding the fact that pesticide manufacturing is "an industry that long has been the focus of great public concern and significant government regulation." *Id.* at 1008, 1011.

The Federal Circuit similarly held in *United Nuclear Corp. v. United States*, 912 F.2d 1432, 1436 (Fed. Cir. 1990), that even though the plaintiff had "voluntarily submitted" itself to a regulatory scheme, it did not reasonably expect that the government might change the fundamental rules under that scheme. There, the court found a taking based on the government's refusal to permit mining in accordance with leases it had approved allowing the plaintiff to mine uranium on land within an Indian reservation. *Id*. at 1438. With respect to the reasonableness of the plaintiff's investment-backed expectations, the court rejected the holding below that "it would have been reasonable and prudent for [the plaintiff] to question at the outset whether rules, regulations and requirements under the existing scheme, to which it voluntarily submitted itself, would change during the 10-year term of its lease." *Id.* at 1436 (plaintiff "justifiably believed and expected" that it would be permitted to mine in accordance with the leases).

Significantly, the court was not persuaded by language in the leases subjecting them to "all regulations of the [Secretary] now or hereafter in force and relative to such leases . . . .'" *Id.* The Federal Circuit found that even though the plaintiff "agreed that the leases would be subject to future regulations," it reasonably did not contemplate that the government would change its policies and thereby frustrate the plaintiff's investment-backed expectations. *Id.*; *see also NRG Co. v. United States*, 24 Cl. Ct. 51, 62 (1991) (following *United Nuclear Corp.* to hold that it

"certainly was not reasonably foreseeable at the time [certain] permits were signed that the government would enact legislation canceling them").[4]

In short, the cases make clear that the mere fact that property is subject to government regulation, no matter how pervasive, does not render the property owner's investment-backed expectations unreasonable where the government itself expressly created those expectations, whether by agreement or through its regulations. By the same token, the fact that a property owner submits to a regulatory regime does not put the property owner on notice that the government may change the rules under that regime in a manner that reneges on prior assurances it made to the property owner. A. Brownstein, *Constitutional Wish Granting and The Property Rights Genie*, 13 Const. Comm. 7, 43 n.112 (Spring 1996) ("Courts are particularly likely to ignore the significance of on-going and substantial regulation of an industry in evaluating owner expectations when plaintiffs can identify specific government conduct that led to the development of their investment-backed expectations.").[5]

---

[4] Courts are also much less likely to find a lack of reasonable investment-backed expectations where the property interests are issue involve real property. *See Branch*, 69 F.3d at 1576 (observing that "the principles of takings law that apply to real property do not apply in the same manner to statutes imposing monetary liability"); *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073-74 (Fed. Cir. 1994) (distinguishing *Ruckelshaus* and *United Nuclear* on the ground that those cases involved a taking of the fundamental right to exclude others); Brownstein, 13 Const. Commentary at 43 n.112 (cases finding a lack of reasonable investment-backed expectations in a regulated field are those "typically not involving real property").

[5] These principles flow from the very nature of the "reasonable investment-backed expectations" inquiry, which the Federal Circuit has described as "a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994). In other words, a property owner is charged with knowledge of any regulatory restraints on the use of the property in effect at the time its expectations were developed. *Id.* ("In legal terms, the owner who bought with knowledge of the restraint could be said to have no reliance interest, or to have assumed the risk of any economic loss."). Thus, a property owner's expectations could not be more reasonable than when they are based on rights granted within that regulatory regime.

Here, the government expressly stated in the promissory notes executed for each of the properties that the owner would be permitted to prepay the mortgages, thereby terminating participation in the Section 515 program, "at any time at [the owner's] option." This commitment was reiterated in contemporaneous FmHA regulations. 7 C.F.R. § 1822.95(c) (1978); 7 C.F.R. § 1965.90(c) (1983). The prepayment right was also confirmed by a statute passed in 1980, which restored the right of owners with pre-1979 contracts to terminate their participation at any time at their option, and ensured that owners with post-1979 contracts could terminate their participation after twenty years. Housing and Community Development Act of 1980, Pub. L. No. 96-399, § 514, 94 Stat. 1671 (1980).

In addition, plaintiff's expectation that she would be able to prepay and leave the Section 515 program was also essential to their decision to participate in the program in the first instance. As this Court found in *Cienega Gardens*, 38 Fed. Cl. at 75, in the HUD context, the prepayment right was "[o]ne of the primary incentives offered by HUD to the property owners to encourage the construction and development of low-income housing" and "an essential aspect" of the program, without which the plaintiffs never would have entered into the program. The Court went on to find it "clear that without the ability to charge market level rents upon prepayment and conversion to conventional [market properties], plaintiffs' anticipated prepayment rights would have been meaningless and purposeless." *Id.* Here, too, the original contract documents would not have been executed absent the government's assurance that the mortgages could be prepaid without restriction according to the terms of the promissory notes. Complaint ¶ 36.

Finally, the government not only created the relevant expectations by expressly agreeing that the owners would be able to prepay and leave the Section 515 program, it actually went a step further by promising the contracts would not be subject to inconsistent regulations, either

present or future. *See* Carp. Decl., Exs. E, G, J. The case law makes clear that based on this provision, the owner's expectation that they would be permitted to prepay the mortgages in accordance with the express terms of the promissory notes, contemporaneous regulations, and the 1980 Legislation, was more than reasonable. *See United Nuclear Corp.*, 912 F.2d at 1436 (finding plaintiffs' expectations reasonable even where leases at issue were, by their terms, subject to both existing *and future* regulations); *Cienega Gardens*, 33 Fed. Cl. at 222; *see generally Ruckelshaus*, 467 U.S. at 1011.

* * *

Defendant's position is essentially that when private citizens deal with the government in a regulated field, they cannot reasonably expect that the government will live up to its word. Such an approach, however, would permit the government to redefine property rights at will by simply changing its mind. This would undermine the very purpose of the just compensation clause.[6] The Takings Clause does not permit the government to frustrate investment-backed expectations developed in reasonable reliance on its representations and regulatory and statutory assurances.

*2. The economic impact of plaintiff's inability to prepay without restrictions and convert to market rate rents is severe.*

In analyzing the economic impact of a regulation, the Federal Circuit has held that "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Florida Rock Indus.*, 18 F.3d at 1567; *see also Walcek v. United States*, 44 Fed. Cl.

[6] *See Ruckelshaus*, 467 U.S. at 1012 ("If Congress can 'pre-empt' state property law in the manner advocated by [the government], then the Taking Clause has lost all vitality."); *Loretto*, 458 U.S. at 439 (the government "does not have unlimited power to redefine property rights"); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) (the government "by *ipse dixit*, may not transform private property into public property without compensation"); *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1556 (Fed. Cir. 1985) ("statutory suppression of the Tucker Act is not lightly to be implied").

462, 466 n.5 (1999) (the owner's basis or investment may include both the purchase price and "other capital expenditures that would add to the original cost basis of the property"); *see also Florida Rock Indus. v. United States*, 45 Fed. Cl. 21, 41 (1999) (finding a taking where the plaintiff, "which relied on the regulatory regime in place to support [its intended use of the property], has been treated to only one immediate use for the property: resale at a loss"). Here, plaintiff will present evidence at trial regarding (1) her inability to recoup the initial investment in the projects, (2) whether any sale of their properties would be at a loss, and/or (3) the diminution in the fair market value of the properties.

The severe economic impact of being forced to remain in the Section 515 program is also demonstrated by the meager returns plaintiff is currently receiving on her equity. *See Cienega Garden v. United States*, 331 F.3d 1319, 1342-43 (Fed. Cir. 2003) *Duquesne Light Co. v. Barash*, 488 U.S. 299, 308 (1989) ("If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments."); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) (holding that "return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks"). While owners are permitted an 8% return on their initial investment, this figure stays the same regardless of how much equity the owner has built up in the project. Thus, as the plaintiff continues to pay down the mortgages and the fair market value of the properties continues to rise, her annual return represents a smaller and smaller percentage of her equity. Plaintiff will establish at trial that her maximum annual return on her equity in the properties represents a meager percentage of her current equity in the properties. Accordingly, for all of these reasons, the economic impact of the legislation at issue here, as applied to plaintiff, is severe.

*3. In forcing plaintiff to continue the low-income use of her properties, the government unfairly imposed on plaintiff a burden that should be borne by the public generally.*

Consideration of the final prong of the taking inquiry, the character of the government action, involves a balancing of the public and private interests at stake. *Agins v. Tiburon*, 447 U.S. 255, 261 (1980). Here, several factors militate in favor of placing the financial burden of continuing the Section 515 program on the public generally rather than targeting plaintiff. First, plaintiff did not cause or contribute to the need for low-income housing in rural areas. *See Nollan*, 483 U.S. at 837-42 (finding a taking where government action was not reasonably related to a problem that the property owner created or to which it contributed). In addition, plaintiff receives no reciprocity of advantage from the continued low-income use of her properties. *See Penn Cent. Transp. Co.*, 438 U.S. at 134; *Florida Rock Indus.*, 18 F.3d at 1570. Finally, the 1988 and 1992 Legislation cannot be characterized as an effort to abate a public nuisance. *See Lucas*, 505 U.S. at 1027.

Under these circumstances, the government's desire to maintain affordable housing does not justify its decision to burden plaintiff with the financial brunt of that goal. *Armstrong v. United States*, 364 U.S. 40, 49 (1960) (the Takings Clause is intended to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole"); *Pennsylvania Coal Co.*, 260 U.S. at 416 (a "strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change"); *Florida Rock Indus.*, 18 F.3d at 1571 ("The Government, in a word, must act fairly and reasonably, so that private parties can pursue their interests."). Under the Fifth Amendment, the government must pay for what it has taken.

**III. Plaintiff's Claims Cannot Be Dismissed at this Stage of the Litigation.**

As demonstrated by the discussion above, and the attached Declaration of Robbie Carpenter, the issues raised by defendant's motion to dismiss at best present disputed fact issues that must be resolved at trial. Further, in a case such as this where the determination of a jurisdictional issue requires resolution of the merits, a delay in the determination is warranted until sufficient facts have been presented. *See* 5A Wright & Miller § 1350 at 235; *Kolovitz v. United States*, 1995 U.S. Dist. LEXIS 912, at *6 (N.D.Ill. 1995) ("[I]f the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction depends on resolution of factual issues which go to the merits of the case; in this situation, resolution of the jurisdictional issue should await a determination of the relevant facts via a summary judgment motion or at trial."); *see also Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990); *Crawford v. United States*, 796 F.2d 924, 929 (7th Cir. 1986); *Augustine v. United States*, 704 F.2d 1074, 1077-78 (9th Cir. 1983).

Finally, even assuming that the Court agrees with defendant's arguments, dismissal of the complaint would not be the appropriate remedy. Rather, in that event, plaintiff should be granted leave to substitute the estate of Ms. Maxine Carpenter, deceased, for the current plaintiff. As this Court has held, "[e]ven if litigation is commenced by other than a 'real party in interest,' however, dismissal is not appropriate until a reasonable time following an objection on that basis for 'ratification of commencement of the action by, or joinder or substitution of, the real party in interest . . . .'" *First Fed. S&L Ass'n of Rochester v. United States*, 58 Fed. Cl. 139, 152 (1992) (citing RCFC 17(a)). Further, in any event, Ms. Roberta Carpenter is the personal representative of the estate of Maxine Carpenter, which permits her the "same standing to sue … as [the] decedent has immediately prior to death." Mont. Code Ann. § 72-3-604.

## CONCLUSION

For the reasons set forth above, plaintiff respectfully requests that defendant's motion to dismiss be denied. Alternatively, should the Court determine that plaintiff Roberta Carpenter is not the real party in interest in this case, plaintiff requests that the Court grant plaintiff leave to amend the complaint to substitute the real party in interest.

Dated: April 21, 2005

**s/Jeff H. Eckland**

**Filed Electronically**

Jeff H. Eckland
Mark J. Blando, Of Counsel
ECKLAND & BLANDO LLP
700 Lumber Exchange
10 South Fifth Street
Minneapolis, MN 55402
Tele: 612-305-4444
Fax: 612-305-4439