# In the United States Court of Federal Claims

TO BE PUBLISHED
No. 04-1740 C
Filed February 10, 2006

| | |
|---|---|
| ROBERTA R. CARPENTER, SURVIVING JOINT COTENANT,<br><br>Plaintiff,<br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | FmHA housing loan program, section 515 of the Housing Act of 1949, Emergency Low Income Housing Preservation Act of 1987 (ELIHPA), RCFC 12(b)(1), privity of contract, joint tenant, right of survivorship, assumption of mortgage, RCFC 17(a), real party in interest, Fifth Amendment, taking, RCFC 12(b)(6), *Penn Central* analysis, regulatory taking |

Jeff H. Eckland, Mark J. Blando, Eckland & Blando LLP, Minneapolis, Minnesota, for plaintiff.

Shalom Brilliant, Senior Trial Counsel, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on defendant's motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") or for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6). Plaintiff has requested leave to file an amended complaint should the Court conclude that it otherwise lacks subject matter jurisdiction. For the following reasons, defendant's motion to dismiss is DENIED and plaintiff's request, treated as a motion, for leave to file an amended complaint is GRANTED.

## *BACKGROUND*[1]

In 1962, Congress added section 515[2] to the Housing Act of 1949 to authorize the Secretary of Agriculture to make loans to private entities "to provide rental housing and related facilities for elderly persons and elderly families of low or moderate income in rural areas . . . ." Pub. L. No. 87-723, § 4(b), 76 Stat. 670, 671 (1962); Def.'s Mot. Dismiss. ("Def.'s Mot.") at 4. The loan program was administered by the Farmers Home Administration ("FmHA")[3] of the Department of Agriculture ("USDA"). In 1966, Congress expanded the section 515 loan program to encompass rental housing for "other persons and families of low income." Pub. L. No. 89-754, § 804, 80 Stat. 1255, 1282 (1966).[4]

In 1979, Congress found that many participants in the FmHA program had begun to prepay their loans. Def.'s Mot. at 4. Fearing that the prepayment of FmHA loans would threaten the availability of rural low and moderate-income housing, Congress amended the National Housing Act to prevent the loss of low-cost rural housing due to prepayments.[5] *Id*. at 4-5. This amendment prohibited the FmHA from accepting prepayment of any FmHA loan made before or after the date of the enactment of the amendment unless the owner agreed to maintain the low-income cost of the rental housing for either 15 or 20 years from the date the loan originated. *Id*. at 5. In 1980, Congress eliminated the retroactive application of the 1979 amendment.[6] *Id*. Henceforth, the prepayment restrictions in the 1979 amendment would apply only to loans entered into after the enactment of that amendment on December 21, 1979. *Id*.

---

[1] The recitation of facts in this section does not constitute findings by the Court. All of the stated facts are either undisputed or alleged and assumed to be true for the purposes of the pending motions.

[2]Pub. L. No. 87-723, § 4(b), 76 Stat. 670, 671 (1962) (codified as amended at 42 U.S.C. § 1485).

[3] The FmHA was succeeded by the Rural Housing and Community Development Services ("RHCDS"), *see* Pub. L. No. 103-354, § 233, 108 Stat. 3178, 3219-20 (1994), which changed its name to Rural Housing Service ("RHS"). *See* 61 Fed. Reg. 2899 (Jan. 30, 1996). "FmHA" shall refer to Farmers Home Administration or its successor agencies, as appropriate.

[4]The scope of section 515 was broadened by the enactment of section 521, which expanded the availability of loans made under section 515. *See* Pub. L. No. 90-448, § 1001, 82 Stat. 476, 551 (1968) (codified as amended at 42 U.S.C. §1490a); Def.'s Mot. at 4.

[5]Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, § 503, 93 Stat. 1101, 1134-35 (1979).

[6]Housing and Community Development Act of 1980, Pub. L. No. 96-399, § 514, 94 Stat. 1614, 1671-72 (1980).

By 1987, Congress had again become concerned that prepayment of FmHA loans would threaten the availability of low and moderate income housing. *See* Compl. ¶ 22. In response to these concerns, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"),[7] which again imposed restrictions on prepayment of pre-1979 FmHA loans. *See* Compl. ¶¶ 22-27. Plaintiff alleges that this legislation contained provisions which were designed to "place the pre-1979 FmHA contract holders 'on the same playing field' as the post-1979 FmHA contract holders already subject to a restrictive-use clause." Compl. ¶ 24. In 1992, Congress enacted the Housing and Community Development Act of 1992.[8] Compl. ¶ 28. ("HCDA" hereinafter refers to this legislation, rather than the 1980 legislation of the same name.) This legislation extended the prepayment restrictions that ELIHPA had imposed upon pre-1979 loans to all loans made before 1989. Compl. ¶ 29.

Under this framework, Harlan Carpenter and Maxine Carpenter ("the Carpenters"), parents of plaintiff, jointly entered into three separate loan agreements with the FmHA with respect to three properties located in Montana. *See* Compl. ¶¶ 9, 15; Pl.'s Opp'n Def.'s Mot. Dismiss ("Pl.'s Opp'n") at 3.[9] The Carpenters and FmHA executed the first such agreement on October 7, 1975 ("Sage Apartments"),[10] the second agreement on March 10, 1976 ("Project I Apartments"),[11] and the third agreement on December 18, 1980 ("Project II Apartments").[12] Compl. ¶ 9. Although certain terms varied, each loan agreement required the Carpenters:

> (i) to construct and maintain housing in accordance with FmHA's specifications; (ii) to use [the] FmHA projects for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate FmHA regulations; (iii) to charge no higher rents than those permitted by FmHA; (iv) to make timely payments on [the] mortgages; and (v) to maintain certain cash reserves.

Compl. ¶ 17.

---

[7]Pub. L. No. 100-242, §§ 201-263, 101 Stat. 1815, 1877-91 (1988) (codified in relevant part as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l* note).

[8]Pub. L. No. 102-550, § 712, 106 Stat. 3672, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c)).

[9]Both Harlan and Maxine Carpenter were signatories to the original closing documents. Pl.'s Opp'n at 3-4.

[10]Case and Project Number 31-048-517309660, 03-3.

[11]Case and Project Number 31-056-517309660, 02-1.

[12]Case and Project Number 31-056-517309660, 01-0.

The Carpenters and FmHA entered into promissory notes and real estate mortgages for each property contemporaneously with the loan agreements, and the notes and mortgages were referenced in the agreements. Compl. ¶ 16. Each of these promissory notes provided, *inter alia*, that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." *Id*. Plaintiff alleges that the Carpenters, therefore, were permitted "to terminate their participation in the Government's housing programs . . . upon prepayment of each housing project's federally made or insured mortgage." Compl. ¶ 2. Plaintiff alleges that pursuant to the promissory notes, the optional right to terminate participation in the section 515 program could be exercised at any time prior to the expiration of the agreements' 50-year terms. Compl. ¶ 2.

The Carpenters operated and maintained the properties jointly until Harlan Carpenter's death in February 1991, whereupon the property passed to his wife, Maxine Carpenter. Pl.'s Opp'n. at 4. Maxine Carpenter remained the sole owner of the property until August 2000, at which time she learned that she was terminally ill. *Id*. Upon learning of her illness, Maxine Carpenter "took immediate action to ensure that title to the property–along with all the rights and obligations related to the property–would pass directly to her daughter by operation of law upon her death." *Id*. Maxine Carpenter deeded title to the three properties to herself and to plaintiff as joint tenants with right of survivorship. *Id*. Upon Maxine Carpenter's death in September 2000, plaintiff became the sole surviving joint tenant.

In Count 1 of her complaint, plaintiff alleges that ELIHPA, HCDA, and FmHA's implementing regulations constituted an anticipatory repudiation of FmHA loan holders' contractual right to prepay their loans and thereby terminate their contracts with FmHA at their option. Compl. ¶¶ 38, 50. Plaintiff further alleges that, but for defendant's repudiation of plaintiff's right to prepay FmHA loans, plaintiff and Maxine Carpenter, the deceased joint tenant, would have exercised their option of prepaying their loans at a date such that they would have maximized the return on their investment. Compl. ¶ 36.

In Count 2 of her complaint, plaintiff alleges that ELIHPA, HCDA, and FmHA's implementing regulations resulted in a taking of property for public use without just compensation. Compl. ¶¶ 39, 53. Plaintiff argues that defendant has conscripted her properties for public use, physically invaded her properties, and deprived her of distinct investment-backed expectations with regard to her properties without providing just compensation. *Id*.

## *DISCUSSION*

## I. Standard of Review

Defendant has moved to dismiss plaintiff's claims for lack of jurisdiction pursuant to RCFC 12(b)(1), or for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). The Court treats defendant's motion with respect to plaintiff's contract claim as a RCFC 12(b)(1) motion because defendant's challenge to that claim centers upon the

jurisdictional issue of privity of contract. The Court considers defendant's motion with respect to the taking claim to be a RCFC 12(b)(6) motion because it challenges plaintiff's ability to establish an uncompensated taking of private property under applicable precedent.

Pursuant to RCFC 12(b)(1), the Court is required to grant defendant's motion to dismiss if it finds that it does not possess jurisdiction over plaintiff's claim. Once jurisdiction is challenged, the plaintiff bears the burden of establishing jurisdiction. *Holland v. United States*, 57 Fed. Cl. 540, 550 (2003) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)). When deciding a motion to dismiss, the court must assume that all undisputed facts alleged by the non-moving party are true and must draw all reasonable inferences in the non-movant's favor. *Mexican Intermodal Equipment, S.A. de C.V. v. United States*, 61 Fed. Cl. 55, 59 (2004) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). When the facts regarding jurisdiction are in dispute, the court may consider all relevant evidence in order to resolve factual disputes, including evidentiary matters outside the pleadings. *Wilson v. United States*, 58 Fed. Cl. 760, 762 (2003) (citing *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985)).

Dismissal under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted is appropriate when the facts as alleged in the complaint do not entitle the plaintiff to a legal remedy. *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000). In reviewing a motion to dismiss, the court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in favor of plaintiff. *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998). The case may be properly dismissed, however, if plaintiff "can prove no set of facts in support of his claim that would entitle him to relief." *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed. Cir. 1998); *New York Life Ins. Co. v. United States*, 190 F.3d 1372, 1377 (Fed. Cir. 1999).

## II. Plaintiff's Contract Claim

Plaintiff alleges jurisdiction under the Tucker Act, 28 U.S.C. § 1491. Compl. ¶ 12. The Tucker Act confers jurisdiction upon the Court of Federal Claims "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1) (2000). In order to maintain an action founded upon contract under the Tucker Act, the contract in question must be between the plaintiff and the Government, that is, privity of contract must exist between the plaintiff and the United States. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("*Cienega IV*") (quoting *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) and citing *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984)). "The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity." *Id.* (citing *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d 1423, 1436 (Fed. Cir. 1997)).

With respect to plaintiff's contract claim, defendant challenges the Court's subject matter jurisdiction on the basis that plaintiff is not in privity of contract with the Government. Defendant asserts that "[t]he complaint does not allege that [plaintiff] herself executed any contract document, made any promise, or agreed to anything, either when the contracts in question were signed or thereafter" and that the estate of Maxine Carpenter, plaintiff's mother and deceased joint tenant, remains the party in privity with FmHA. Def.'s Mot. at 11.

**A. Plaintiff Did Not Come into Privity of Contract with the Government by Operation of the Right of Survivorship; Assumption of the Mortgages and Notes Is Necessary to Establish Privity**[13]

Plaintiff argues that her acquisition of sole legal title to the mortgaged real property by operation of the right of survivorship placed her in the position of the original borrower under the section 515 contracts with FmHA and, therefore, in privity of contract with the Government. *See* Pl.'s Opp'n at 5-7; Pl.'s Supplemental Br. Supp. Pl.'s Opp'n. ("Pl.'s Suppl. Br.") at 2-5. Defendant responds that privity is lacking because plaintiff is not the borrower and was not a party to the promissory notes, and that plaintiff's acquisition of title to the real property did not place her in the position of the borrower.[14] *See* Def.'s Reply at 4; Def.'s Suppl. Br. at 4-7. For

---

[13]The Court's discussion of privity focuses primarily on the promissory notes and the mortgages that secure the notes because the prepayment right allegedly repudiated is found within the promissory notes. *See supra* at 4. However, the analysis implicitly includes the loan agreements that accompanied the promissory notes and the mortgages (and were executed contemporaneously with those documents). The loan agreements contained the restrictions and requirements that would be terminated by prepayment of the notes and that are likewise secured by the mortgages. *See* Compl. ¶¶ 15-18.

[14]In its supplemental brief, defendant expresses agreement with plaintiff's assertion that "Montana statutes and case law make clear that plaintiff is bound by the obligations of the *mortgage* executed by her deceased cotenant." Def.'s Resp. Pl.'s Suppl. Br. ("Def.'s Suppl. Br.") at 3 (quoting Pl.'s Suppl. Br. at 2). Defendant proceeds to emphasize the distinction between the mortgages and the promissory notes containing the prepayment provisions at issue, arguing that even though plaintiff is bound by the mortgages, plaintiff did not assume the notes or succeed to the prepayment rights contained therein. *See id.* at 4. In the Court's view, defendant concedes too much in agreeing that "plaintiff is bound by" the mortgages, thereby causing it to put undue emphasis on the distinction between the mortgages and notes at some points in its argument. If the privity inquiry actually turned on the distinction between the mortgages and the promissory notes, it seems plaintiff would likely prevail at this stage. *See* RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 5.1 cmt. a (1997) ("While it is possible in principle for the transferee to assume the obligation represented by the note but not the covenants in the mortgage, or vice versa, this intention is surely rare and should not be found absent very clear and explicit evidence."); *cf. Cienega IV*, 194 F.3d at 1234-35, 1245-46 (Department of Housing and Urban Development ("HUD") was a party to neither the deed of trust notes containing the prepayment

the following reasons, the Court concludes that under Montana property law, plaintiff did not "step into the shoes" of the borrower when she took fee simple title to the land by operation of the right of survivorship, and therefore she is not in privity of contract with the Government merely as a result of her ownership of the mortgaged properties.

As a general rule, a transferee of mortgaged real property does not "step in the shoes" of the original mortgagor absent an assumption of the mortgage by the transferee:

> When mortgaged real estate is transferred without assumption of liability:
>
> (a) the mortgage remains effective against the real estate in the hands of the transferee; and
>
> (b) the *transferor remains personally liable for the covenants in the mortgage and for the obligation secured by the mortgage*, to the extent such liability existed prior to the transfer; and
>
> (c) in the event of a default in the performance of the obligation secured by the mortgage, the mortgagee has the right (except as limited by the parties' agreement, by statute, and by §§ 5.3, 8.2, and 8.4):
>
> (1) to proceed against the transferor personally, to the extent of the transferor's liability, and
>
> (2) to enforce the mortgage, and thereafter to proceed against the transferor personally, to the extent of the transferor's liability, for any deficiency.
>
> (d) The *transferee does not become personally liable, by virtue of the transfer, for the obligation secured by the mortgage*.

RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 5.2 (1997) (emphasis added); *see Lang v. Caldwell*, 34 P. 957 (Mont. 1893). As discussed in the following paragraphs, it appears that this rule applies with no less force when, as here, a mortgagor who is a fee simple owner conveys the property to herself and another as joint tenants with the right of survivorship and the transferee then obtains full title upon the death of the transferor-mortgagor.

Plaintiff cites *Raucci v. Davis*, 505 P.2d 887 (Mont. 1973) in support of the proposition that "upon the death of one co-tenant, the surviving co-tenant steps in the shoes of the deceased co-tenant with respect to the rights and obligations of the mortgage." Pl.'s Supp Br. at 4. It is

---

provisions nor the deeds of trust (mortgages) securing the notes, and therefore was not in privity with the borrower with respect to contractual prepayment rights). What is really at issue regarding survivorship and privity of contract, and what defendant's argument indeed appears to bear out, is the distinction between (a) the legal obligations created by the loan agreements, mortgage covenants, and the terms of the notes and (b) the encumbrances placed upon the real property by the mortgages in order to secure those obligations, *i.e.*, the mortgage liens. Plaintiff clearly took title subject to the latter. The question is whether she has become a party to the mortgages and notes.

true that in setting forth the factual background of the case, the *Raucci* court observed that the surviving joint tenant "became the sole owner of the note and mortgage by right of survivorship." *Raucci*, 505 P.2d at 888. In that case, however, the mortgagor had executed the promissory note in favor of *both* joint tenants. *See id*. Neither privity of contract nor the effect of the right of survivorship was at issue. *Raucci*, therefore, does not support a finding of privity where the joint tenant in question was not a party to the mortgage agreements.

Plaintiff next cites *In re Estate of Vincent*, 98 S.W.3d 146 (Tenn. 2003), a decision of the Tennessee Supreme Court in which, as in this case, the owner of the real estate executed a note and mortgage in favor of a lender and subsequently conveyed full title in the property to himself and the plaintiff as joint tenants with right of survivorship. *Id*. at 147-48. Plaintiff took sole title upon the transferor-mortgagor's death. *See id*. at 148. Plaintiff here quotes the concluding sentence of the court's analysis in support of her argument that she became personally obligated under the mortgage upon Maxine Carpenter's death: "Under these facts, having taken the property subject to the mortgage, Vincent must continue to pay the mortgage in order to continue to enjoy ownership." *Id*. at 151; Pl.'s Suppl. Br. at 4. Plaintiff, however, ignores the court's more complete explanation of its reasoning: "We agree that the *plaintiff has no legal obligation* to pay the mortgage. However, *as a practical matter*, the plaintiff must continue to pay the mortgage in order to continue to enjoy the benefits of ownership. . . . [T]he *estate* in this case would be responsible for any deficiency on foreclosure of the Deerfield property." *Vincent*, 98 S.W.3d at 150 (emphasis added). Clearly, the *Vincent* court was acting in accordance with the general rule that, absent an assumption of the mortgage, a transferee is not liable for the covenants and obligations secured by the mortgage or contained in the underlying note.[15] The fact that practicality requires a transferee to pay the mortgage in order to avoid foreclosure does not put the transferee in the position of the borrower as a matter of law, nor does it otherwise establish privity of contract between the transferee and the lender-mortgagee. *Vincent* therefore stands for exactly the opposite of the proposition that plaintiff urges the Court to adopt.[16]

---

[15]The actual issue in *Vincent* was whether the plaintiff was entitled to exoneration of the mortgage debt by the decedent's estate. *See Vincent*, 98 S.W.3d at 148.

[16]Plaintiff also asserts that section 27-1-421 of the Montana Code supports her argument that "the practical meaning of the law in Montana requires a successor in title to take over the mortgage obligations in order to enjoy the ownership of the property." Pl.'s Suppl. Br. at 3. The statute provides:

> Whenever an obligation in respect to real property would be specifically enforced against a particular person, it may be in like manner enforced against any other person claiming under him by a title created subsequently to the obligation except a purchaser or encumbrancer in good faith and for value, and except that any such person may exonerate himself by conveying all his estate to the person entitled to enforce the obligation.

Finally, the mortgages themselves confirm that plaintiff did not, in her capacity as the surviving joint tenant, become a party to the mortgages by operation of the right of survivorship. The mortgages state that the covenants therein are made on behalf of the borrower and the borrower's "heirs, executors, administrators, successors, and assigns." As plaintiff herself observes, the "surviving joint tenant 'is neither a successor nor an assign.'" Pl.'s Suppl. Br. at 7 (quoting *Townsend v. Chase Manhattan Mortgage Corp.*, 657 N.W.2d 741, 744 (Mich. Ct. App. 2002)). Having concluded, therefore, that plaintiff did not come into privity of contract with the Government absent an assumption of the mortgages and notes, the Court now turns to whether plaintiff's allegations could, if true, support a conclusion that such an assumption occurred.

### B. Plaintiff Cannot Establish That She Assumed the Mortgages and Notes

An assumption of liability under a mortgage need not be in any particular form; "[a]ny words indicating the transferee's intent to undertake personal liability for the obligation will suffice." RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 5.1 cmt. a (1997). It appears that mortgage assumption agreements in Montana need not be in writing. *See* Mont. Code Ann. § 28-11-105(3)(c); RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 5.1 statutory note on mortgage assumption formalities (1997).

In its motion to dismiss, defendant asserts that plaintiff has not alleged that she executed any contract document, or otherwise promised or agreed to anything with respect to the contract documents at issue. Def.'s Mot. at 11. Defendant also states that plaintiff does not allege that she entered into any novation or assumption agreement or that she was a third-party beneficiary of the contracts. *Id*. Plaintiff submits several documents, and alleges certain actions by FmHA, as evidence that plaintiff has "stepped into the shoes" of the borrower as the individual legally responsible for performing the obligations of the mortgages and notes and that the FmHA recognized that she had assumed such responsibility. First, plaintiff has made the mortgage payments on each of the properties. Pl.'s Suppl. Br. at 10. Plaintiff also submitted a budget form for each property that listed Maxine Carpenter and Roberta Carpenter on the "borrower" line of the form and which was approved (by signature) by a USDA official. Plaintiff asserts that these documents "explicitly recognize Roberta Carpenter as liable for the obligations" in the mortgages and notes. *Id*. Plaintiff further states that FmHA "expressly allowed Roberta Carpenter to exercise rights that were previously exercised by Maxine Carpenter" including authorization to access the reserve accounts for the properties *Id*. Plaintiff has submitted the documents establishing such authorization. Finally, plaintiff alleges FmHA has otherwise treated plaintiff "as if she was an owner in the Section 515 program" by, for example, requesting that she cover a portion of appraisal costs for which owners are responsible pursuant to agency regulations. *Id*.

---

Mont. Code Ann. § 27-1-421. This statute appears to establish only that when an obligee would be entitled to the remedy of specific performance against a particular individual, the obligee may seek specific performance against any person with a subsequent title, so long as that person is not a bona fide purchaser or encumbrancer. This case does not (and cannot) involve the remedy of specific performance, and therefore the relevance of the statute remains unclear to the Court.

Defendant counters that plaintiff's documents may establish that the Government viewed plaintiff "to be acting as or for the owner," but nothing in the documents indicates that she was acting other than as a representative of Maxine Carpenter's estate or even that the Government was aware that plaintiff had acquired ownership by a deed executed by Maxine Carpenter. Def.'s Suppl. Br. at 8.

Assuming for the purposes of this motion that FmHA was aware that plaintiff was Maxine Carpenter's surviving joint tenant[17] and further assuming that FmHA allowed plaintiff to exercise certain powers previously exercised by Maxine Carpenter and otherwise treated plaintiff like a section 515 participant, plaintiff's allegations and documentary submissions cannot establish that she assumed the mortgages. A mortgage assumption is a relatively informal undertaking under Montana law, but the transferee must at least evince an intent to take on *personal liability* for the contractual obligations.[18] The allegations and documents put forward by plaintiff might establish, at most, that plaintiff had certain authority and responsibility necessary to the *management* of the properties under the section 515 program or that she was exercising authority and discharging her responsibilities in her capacity as the personal representative of Maxine Carpenter's estate. *See* Section II. C., *infra*. The submissions do nothing to establish that plaintiff assumed personal liability for the obligations contained in the mortgages and notes (e.g., personal monetary liability for a deficiency upon foreclosure) so as to put her "in the shoes" of the original borrower.

Indeed, this case is similar to *Grass Valley Terrace v. United States*, __ Fed. Cl. ___, No. 98-726C, 2005 WL 3497799 (Dec. 21, 2005), in which the court acknowledged the apparent lack of privity between one of the plaintiffs and FmHA. In that case, several family members acquired the properties in question and each of them signed assumption agreements with FmHA that incorporated the terms of the notes and mortgages, including the prepayment right. *Id*. at ___, *11. They then transferred their interests in the property to a family trust called ABCD, in which the family members retained an interest. *Id*. The court stated:

---

[17]Plaintiff asserts that the budget forms submitted for agency approval demonstrate FmHA's acquiescence to or approval of the creation of the joint tenancy. Pl.'s Suppl. Br. at 9 n.7. Although the appearance of plaintiff's name along with Maxine Carpenter's name on the "borrower" line might indicate that plaintiff was acting on behalf of Maxine Carpenter, the Court sees nothing on the face of the budget forms that gives any indication that Maxine and Roberta Carpenter were joint tenants or that FmHA was otherwise aware of their status as such.

[18]Essentially, assumption of liability for default is what makes one a party to a contract. "Virtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: 'The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,–and nothing else.'" *United States v. Winstar Corp.*, 518 U.S. 839, 919 (1996) (Scalia, J., concurring in the judgment) (quoting Oliver Wendell Holmes, *The Path of the Law*, *in* 3 THE COLLECTED WORKS OF JUSTICE HOLMES 391, 394 (S. Novick ed., 1995)).

> Based on the evidence in the record, it does not appear that ABCD is in privity of contract with the FmHA. The assumption agreements that allowed the Koh family to take over the properties at issue were signed by individual members of the Koh family, and not by the trustee of ABCD. It appears that subsequent to the execution of the loan agreements the Koh family members placed their respective interests into ABCD, but it does not appear that this transfer altered the parties to the underlying loan agreement. In addition . . . Plaintiff has yet to identify any evidence indicating that ABCD was a party to the loan agreement.

*Id*. at ___, *13 (citation omitted).[19] The court indicated that the family members who signed the assumption agreements were the most likely real parties in interest to the contract claims.[20] *Id*. at ___, *14. Likewise, in this case it is apparent that the estate of Maxine Carpenter remains the party in privity of contract with the Government with respect to the mortgages and the promissory notes (and the prepayment right contained in the notes).

By contrast, in *Anaheim Gardens v. United States*, No. 93-655C, 1997 WL 580613 (Fed. Cl. Sept. 16, 1997), the court found privity where plaintiffs were not the original contracting parties to the notes and regulatory agreements (under a HUD low-income housing program) but had "assumed ownership and responsibility for" the properties "with the blessing of defendant, who has treated them as if they had stepped into the shoes of the original owners." *Id*. at *4. In so holding, the *Anaheim Gardens* court relied upon *United International Investigative Services v. United States*, 26 Cl. Ct. 892 (1992), which held that a successor-in-interest to a government contract was in privity with the Government. First, as discussed in Section II. A., *supra*, plaintiff here is not, by operation of law, the successor-in-interest to the contracts at issue. Second, in *United International*, "plaintiff *assumed all contractual duties*, dealing directly with defendant in its own name as the prime contractor throughout the course of performance." *Id*. at 897 (emphasis added). Here, there is no indication that plaintiff has assumed liability for the duties of the borrower under the loan agreements, mortgages, and notes, nor is there any allegation that would lead to the conclusion that defendant considered plaintiff to have "stepped into the shoes" of the borrower with respect to her legal responsibilities under those instruments. Having concluded that no privity of contract exists between plaintiff in her personal capacity and the

---

[19]*Grass Valley* also supports the Court's conclusion in Section II. A., *supra*, because although the Koh family members became parties to the mortgages by way of the assumption agreements they signed, the ABCD trust apparently did not succeed the family members as parties to the mortgages when it became the owner of the property. Presumably, a subsequent assumption of the mortgages by ABCD would have been necessary to create privity of contract.

[20]The *Grass Valley* court kept open to plaintiff, as an alternative to joinder or substitution of the real party in interest under RCFC 17(a), the possibility of "producing sufficient evidence to demonstrate that ABCD is, in fact, the real party in interest." *Grass Valley*, __ Fed. Cl. at ___, 2005 WL 3497799 at *14. In this case, the Court concludes that plaintiff was not in privity of contract with the Government.

Government, the Court now considers plaintiff's request that the Court deny defendant's motion to dismiss and allow plaintiff to substitute the real party in interest.

### C. Maxine Carpenter's Estate is in Privity of Contract with Defendant, and Plaintiff, as Personal Representative of the Estate, May Sue in Her Own Name on Its Behalf

Although in many cases a lack of privity of contract between the named plaintiff and the Government would require dismissal for lack of subject matter jurisdiction under RCFC 12(b)(1), the specific circumstances of this case cause the apparent jurisdictional defect to resolve into a matter of identifying the real party in interest, *i.e.* the party who *is* in privity with the Government. The parties appear to agree, and the principles of real property law discussed in Section II. A., *supra*, confirm, that absent an assumption of the mortgages by plaintiff the proper party to the claims arising out of the mortgages and promissory notes is the estate of Maxine Carpenter. *See* Pl.'s Opp'n at 21; Def.'s Reply at 9; Status Conference Tr. 32, July 25, 2005.

Plaintiff has requested "leave to amend the complaint to substitute the real party in interest" pursuant to RCFC 17(a). Pl.'s Opp'n at 22; *see id*. at 1, 21. RCFC 17(a) provides:

> Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's name without joining the party for whose benefit the action is brought. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Defendant opposes plaintiff's request, arguing that the claim pleaded in the complaint is not that of the estate, but rather that of plaintiff. Def.'s Reply at 9. Defendant contends that the ownership rights at issue (presumably in the taking claim) and the resultant harm from the alleged taking of those rights pertain solely to plaintiff as the owner of the properties, that the only right alleged in the complaint that belongs to the estate is the contractual right to prepay, and that to the extent the estate is entitled to file a suit for the violation of its contract rights, no such claim has so far been pleaded. *Id*. According to defendant, "the present suit cannot be transformed into such a suit [on behalf of the estate] merely by substitution of plaintiffs." *Id*.

The Court is unconvinced that dismissal is the proper course in this case. It does not follow from the possibility that plaintiff is the real party in interest with respect to the taking claim (at least insofar as it asserts a taking of her ownership rights) that the defect in plaintiff's contract claim cannot be remedied by substituting the real party in interest as to that claim.

Although the presence of a single individual appearing as a plaintiff in two different capacities and asserting alternate theories of recovery may complicate the analysis of the respective entitlements of plaintiff and the estate (*see* footnote 21, *infra*), this potential difficulty is not an adequate reason to dismiss one of the theories of recovery at this stage.

Defendant's assertion that a claim on the part of the estate has not been pleaded and that such a defect cannot be remedied by substitution of the proper plaintiff is unconvincing. *Grass Valley* is directly on point with respect to plaintiff's reliance upon RCFC 17(a) in this case. Upon noting the apparent lack of privity of contract and identifying the likely real parties in interest, the *Grass Valley* court determined that dismissal was not the proper remedy and that "[u]nder RCFC 17(a), [plaintiff was] entitled to an opportunity to correct this apparent defect" in its claim. *Grass Valley*, __ Fed. Cl. at ___, 2005 WL 3497799 at *14. A subsequent opinion involving a different plaintiff in the *Grass Valley* case lends further support to the conclusion that substitution is proper here. In *Grass Valley Terrace v. United States*, __ Fed. Cl. ___, No. 98-726C, 2006 WL 242674 (Jan. 31, 2006), the court rejected defendant's argument that plaintiff's claims could not be construed as those of the real party in interest (and in privity) because they were "unmistakably pleaded as [the deceased plaintiff's] own," stating that although plaintiff did not enter into a contract with FmHA, "the claims, the contract, and the property, at issue, remain the same. . . . [T]his situation seems to be precisely what RCFC 17(a) contemplates–the original party, by mistake or otherwise, filed suit on her own behalf rather than on behalf of the partnership." *Id*. at ___, *2.

RCFC 17(a) allows an executor or administrator to "sue in that person's name without joining the party for whose benefit the action is brought." Plaintiff has represented that she is the personal representative of Maxine Carpenter's estate. Pl.'s Opp'n at 21. Plainly, it would be unfair to dismiss plaintiff's complaint where the jurisdictional defect can be remedied simply by Roberta Carpenter's accurately describing the capacity in which she is acting with respect to each claim. *See System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 169-171 (2005) (allowing the subsidiary of the owner of a nuclear power plant, which brought suit on its own behalf and on behalf of the owner, to amend its complaint in order to add the owner as the real party in interest to the asserted taking claim).

Furthermore, plaintiff has represented that if the Court determines that a new complaint is necessary in this case, the claims of the estate pertaining to two of the properties might be time-barred. Pl.'s Suppl. Br. at 11 n.8. The provision of RCFC 17(a) (which is modeled after FED. R. CIV. P 17(a)) that precludes dismissal before a reasonable time has been allowed for ratification, substitution, or joinder of the real party in interest "is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made." FED. R. CIV. P. 17 advisory committee's note to 1966 amendment. The potential statute of limitations problem with respect to the claims of the estate represents the type of forfeiture RCFC 17(a) seeks to avoid. The Court concludes that, pursuant to RCFC 17(a), it is inappropriate to dismiss plaintiff's contract claim and that plaintiff should have the opportunity to cure the defect in her complaint. The Court will therefore grant plaintiff's request, treated as a

motion, for leave to file an amended complaint to add Roberta Carpenter as a plaintiff in her capacity as the personal representative of the estate of Maxine Carpenter.

### III. Plaintiff's Taking Claim

The Fifth Amendment provides, in pertinent part, "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. The Federal Circuit employs a two part analysis to determine whether a governmental action constitutes a taking of private property without just compensation. *Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003) (citing *M & J Coal Co. v. United States*, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995)). The court must first determine whether the claimant has established the existence of a protected property interest for Fifth Amendment purposes. *Id*. If the court determines that such a property interest exists, it then must analyze whether a compensable taking of that interest has occurred. *Id*.[21]

---

[21]The Court notes that the parties have not yet addressed the issue whether the contract claim and taking claim in this case can be pursued simultaneously. *See Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 737-740 (2004); *Allegre Villa v. United States*, 60 Fed. Cl. 11, 18-19 (2004) (each rejecting taking claims in the FmHA program context where the contract claim was viable). This issue might be further complicated in this case by the potential for multiple parties in interest (*i.e.* plaintiff as personal representative of the estate and plaintiff in her personal capacity) as a result of the Court's ruling in Section II, *supra*. The magnitude of this complication may in turn depend upon how the property interest in this case is ultimately characterized. Defendant appears to take the position that the property interest allegedly taken is properly defined as the contractual prepayment right. *See* Def.'s Mot. at 12-13; Def.'s Reply at 5-6; Status Conference Tr. 9-10, July 25, 2005. Plaintiff contends that the alleged taking involves state law real property interests "exist[ing] wholly independent of [the] contracts with the government." Pl.'s Opp'n at 12. *Allegre Villa* might support defendant's characterization because it indicates that, in the FmHA and section 515 context, the contractual remedy provides complete relief. *See Allegre Villa*, 60 Fed. Cl. at 18 ("[P]laintiffs have rested this claim on a contract right to prepayment that was substantially limited by subsequent legislation. Given that contract right, plaintiffs' recovery lies in a theory of breach, not takings.") On the other hand, although the HUD cases are distinguishable from the FmHA cases (in part because the Government was not a party to the contracts at issue), they suggest that defining the property interest allegedly taken may not be a simple task. In *Cienega Gardens v United States*, 331 F.3d 1319 (Fed. Cir. 2003) ("*Cienega VIII*"), the Federal Circuit stated that the property interests "were based on the interaction of *both* real property rights and contractual rights." *Id*. at 1328 (emphasis added). By contrast, in *Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003), a different panel adopted the real-property-rights characterization and rejected the contractual-rights characterization:

> That [prepayment] option right, however, is not really the issue here, except insofar as it is a trigger for exiting the federal housing program. Appellants

### A. Plaintiff Has Alleged a Protected Property Interest

Defendant asserts that plaintiff cannot satisfy the first prong of the Fifth Amendment taking inquiry–the existence of a protected property interest that was subjected to the governmental action. *See* Def.'s Mot. at 12-14. To the extent that the alleged property interest is the contractual prepayment right, defendant takes the position that plaintiff possessed no such right due to lack of privity. *See id*. at 12-13. Defendant further contends that to the extent plaintiff alleges a taking of an interest in real property, plaintiff's taking claim should be dismissed because the properties were subject to the mortgages when plaintiff acquired her title and, therefore, her ownership interest could not have included the right to use the properties "in a manner inconsistent with the terms of the section 515 mortgages." Def.'s Mot. at 13.

It is well-established (and defendant does not contest) that the Fifth Amendment protects rights arising out of a contract with the United States. *Franconia*, 61 Fed. Cl. at 737 (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)). Furthermore, the Court rejects defendant's privity-based argument. To the extent that the taking claim is based upon the alleged taking of the contractual right to prepay, the addition of the personal representative of the estate of Maxine Carpenter as a plaintiff will moot the Government's argument that Roberta Carpenter can state no such taking claim because she was not in privity. *See* Section II. C., *supra*.

Regarding interests in real property, plaintiff's desired utilization of the property would be "inconsistent with the terms of the section 515 mortgages" only due to restrictions imposed directly as a result of ELIHPA and the related legislation. That is, absent the legislation's restriction of the right to prepay, prepayment would have freed the property of the use limitations. Thus, defendant's argument boils down to an assertion that, because the legislation was passed before plaintiff acquired her interest in the property, Maxine Carpenter did not have "the ability to transfer the interest which was possessed prior to the regulation." *Palazzolo v.*

---

> complain about the continued restrictions on the use of their property, not their inability to prepay the mortgage and the concomitant obligation to pay the rate of interest fixed in the mortgage instrument.

*Id*. at 903. As a final alternative, if the Court were to adopt the reasoning of *Franconia*, the characterization of the property interest would become irrelevant. *Franconia* held that the Government necessarily acted in its proprietary capacity when it enacted the legislation that breached the owners' prepayment rights and, therefore, "did not appropriate those properties in its sovereign capacity for public use." *Franconia*, 61 Fed. Cl. at 740. Because the court's conclusion with respect to the taking claim was based upon the nature of the power exercised rather than the nature of the property interest affected, it applied equally to both contractual rights and interests in real property. *Id*. at 739-40. In any event, the issue of simultaneous pursuit of the contract and taking claims need not be decided at this stage. *See Consolidated Edison Co. of N.Y. v. United States*, 67 Fed. Cl. 285, 291-92 (2005) (addressing this issue in the context of spent nuclear fuel contracts).

*Rhode Island*, 533 U.S. 606, 627 (2001). As discussed in Section III. B., *infra*, the argument that the timing of plaintiff's acquisition of the properties itself precludes plaintiff's taking claim is inconsistent with *Palazzolo*.

The Court need not determine at this point the proper characterization of the property interest allegedly taken. For the purposes of defendant's RCFC 12(b)(6) motion, it suffices to say that plaintiff has alleged facts that would establish that she or the estate had a protected property interest that was subjected to the governmental action in question, whether that interest is characterized as a contract right belonging to the estate, a real property right belonging to plaintiff, or both.

### B. The Analysis of Whether the Government's Action Has Effected a Taking Is Highly Factual and Dismissal Pursuant to RCFC 12(b)(6) Is Therefore Inappropriate[22]

The question whether a regulation constitutes a compensable taking under the Fifth Amendment is an "ad hoc, factual inquiry." *Cienega VIII*, 331 F.3d at 1337 (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)). Under *Penn Central*, courts consider three factors in determining whether a regulatory taking has occurred: "(1) [the] character of the governmental action, (2) [the] economic impact of the regulation on the claimant, and (3) [the] extent to which the regulation interfered with distinct investment-backed expectations." *Id.* (citing *Loveladies Harbor v. United States*, 28 F.3d 1171, 1176-77 (Fed. Cir. 1994)). Analysis of the *Penn Central* factors "is a question of law based on factual underpinnings . . . ." *Chancellor Manor*, 331 F.3d at 904.

As the Ninth Circuit has observed, the "admonition [against 12(b)(6) dismissal] is perhaps nowhere so apt as in cases involving claims of inverse condemnation . . . ." *McDougal v. County of Imperial*, 942 F.2d 668, 676 (9th Cir. 1991) (quoting *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986)) (alteration in original). The Federal Circuit has made clear that a *Penn Central* claim requires thorough development of the factual record. In *Chancellor Manor*, the court held that "summary judgment for either party [was] not appropriate on [the] record" before it and remanded to the trial court for fact-finding pertinent to the *Penn Central* analysis. *Chancellor Manor*, 331 F.3d at 904. In *Cienega VIII*, the court adjudicated the so-called Model Plaintiffs' regulatory taking claims based upon "the extensive fact-finding already completed for [those] plaintiffs" by the trial court, *Cienega VIII*, 331 F.3d at 1337, but followed the reasoning of *Chancellor Manor* with respect to the plaintiffs for which no fact-finding had been conducted. *See id*. at 1353-54. In this case, a *Penn Central* analysis would be premature because the limited factual development to this point relates specifically to the issue of privity of

---

[22]To the extent plaintiff alleges a physical taking in addition to a regulatory taking, *see* Compl. ¶ 39, the Court does not reach such assertions because the allegations in support of the regulatory taking theory are sufficient to survive the pending motion and because the parties have not briefed the physical taking theory.

contract.

Defendant nonetheless argues that dismissal of plaintiff's taking claim is proper because on the facts alleged the Government did not, as a matter of law, effect a taking under the *Penn Central* analysis. *See* Def.'s Mot. at 15-19; Def.'s Reply at 6-8. Although the Court, for the reasons set forth in the preceding paragraph, has concluded that further factual development is necessary in order to undertake the *Penn Central* analysis, two aspects of defendant's argument warrant comment at this stage.

First, defendant emphasizes the Eight Circuit's opinion in *Parkridge Investors Ltd. v. Farmers Home Administration*, 13 F.3d 1192 (8th Cir. 1994), in which the court held that the passage of ELIHPA did not work a compensable taking of a section 515 owner's property. The Eighth Circuit determined that "Parkridge's expectation of a continued, unrestricted right to prepay" was not reasonable because when Parkridge assumed the mortgage obligations "it was foreseeable that the government might impair the [plaintiff's] contractual options in order to prevent the program's purposes from being foiled." *Id*. at 1199. The court also noted that any taking that did occur likely was not uncompensated because, as defendant observes in the case at bar, absent prepayment the owner would at worst receive fair market value in a sale to a nonprofit entity pursuant to the section 515 program requirements.[23] *See id*. Although plaintiff emphasizes that this court expressed some disagreement with the rationale of *Parkridge* in *Cienega Gardens v. United States*, 33 Fed. Cl. 196, 222 (1994), the more pertinent observation is that the Federal Circuit distinguished *Parkridge* in *Cienega VIII*, primarily because of significant differences in the effect of ELIHPA on participants in the FmHA section 515 program as compared to its effect on HUD housing program participants. *See Cienega VIII*, 331 F.3d at 1351. The court did not comment on whether it would apply the Eighth Circuit's reasoning in the FmHA context. *See id*. If adopted, *Parkridge* might present a significant hurdle for plaintiff's taking claim. *Parkridge*, however, was decided at the summary judgment stage and the court observed, as did the Federal Circuit, that "the Supreme Court has instructed courts to engage in a factual inquiry" when considering regulatory taking claims. *Parkridge*, 13 F.3d at 1199. That case, therefore, does not support dismissal of the taking claim here.

Second, defendant contends that plaintiff cannot possibly demonstrate a reasonable investment-backed expectation under *Penn Central* because the enactment of ELIHPA and the related legislation predated her acquisition of the joint tenancy. Def.'s Mot. at 16 (citing *M & J Coal*, 47 F.3d at 1153, in which the court stated that "there can be no compensable interference if such land use was not permitted at the time the owner took title to the property"); Def.'s Reply at 6. To the extent that defendant suggests that the timing of plaintiff's acquisition of the properties alone warrants dismissal of her taking claim, such an argument is inconsistent with the Supreme Court's decision in *Palazzolo*. In holding that the petitioner's *Penn Central* claim "[was] not

---

[23]The *Parkridge* plaintiff also "sought the wrong remedy" in asking the court to enforce specific performance of its prerogative to prepay. *Parkridge*, 13 F.3d at 1200.

barred by the mere fact that title was acquired after the effective date of the state-imposed restriction," *Palazzolo*, 533 U.S. at 630, the Court rejected the notion that a "purchaser or a successive title holder . . . is deemed to have notice of an earlier-enacted restriction and is barred from claiming that it effects a taking." *Id*. at 626. Such a rule is not only unfair to successive title holders but also "would work a critical alteration to the nature of property, as the newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation." *Id*. at 627. That language is applicable to this case because Maxine Carpenter possessed the property rights in question but did not convey them to Roberta Carpenter until after the enactment of the restrictions that allegedly constituted a taking of those rights.

As defendant notes, the Federal Circuit has stated that "*Palazzolo* did not reject the principle that 'the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of [the claimant's] expectations.'" *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (quoting *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1350 (Fed. Cir. 2001)). The fact that plaintiff acquired her interest after the enactment of the legislation is *relevant* to the assessment of her reasonable investment-backed expectations. *See Rith*, 270 F.3d at 1350 (relying upon Justice O'Connor's concurrence in *Palazzolo*).[24] However, as set forth in the preceding paragraph, the prior enactment of the legislation does not, in and of itself, cut off plaintiff's right to pursue her *Penn Central* claim at this early stage.

Furthermore, defendant's citation of *M & J Coal v. United States* is unavailing. In that case, the Federal Circuit held that a cessation order, which was based upon the issuing agency's express statutory authority to issue such orders against mining operations found to create an imminent danger to public safety, was not a compensable taking. The court so held because "in accordance with settled precedent, M & J could not have acquired under its deed of title the right to cause damage or a substantial risk of damage to public health or safety." *M & J Coal*, 47 F.3d at 1154. *M & J Coal* is inapposite where, as here, Congress allegedly abrogated a right that *did* exist prior to enactment or imposition of the restriction at issue. The Court concludes that plaintiff's taking claim should not be dismissed pursuant to RCFC 12(b)(6).

## *CONCLUSION*

Plaintiff did not come into privity of contract with defendant by operation of the right of survivorship, nor does she allege any facts establishing that she assumed the mortgages and notes signed by Harlan and Maxine Carpenter. It would nonetheless be improper to dismiss the contract claim pursuant to RCFC 12(b)(1) because the addition of Roberta Carpenter as a plaintiff, in her capacity as the personal representative of the estate of Maxine Carpenter, is

---

[24]At least one of the members of the five-Justice *Palazzolo* majority did not share Justice O'Connor's view: "In my view, the fact that a restriction existed at the time the purchaser took title . . . should have no bearing upon the determination of whether the restriction is so substantial as to constitute a taking." *Palazzolo*, 533 U.S. at 637 (Scalia, J., concurring).

authorized by RCFC 17(a) and would cure the jurisdictional defect. Furthermore, for the reasons stated in Section III, *supra*, it would be improper to dismiss plaintiff's taking claim at this stage of the case pursuant to RCFC 12(b)(6). Defendant's motion to dismiss is therefore DENIED. Plaintiff's request, treated as a motion, for leave to file an amended complaint is GRANTED. Plaintiff shall file and serve her amended complaint on or before **Friday, February 24, 2006**.

The parties shall participate in a joint telephonic status conference on **Friday, March 10, 2006 at 10 a.m.** to discuss the course of further proceedings in this case, including the relationship of such proceedings, if any, to the alternative dispute resolution process presently being conducted by Judge Marian Blank Horn involving a substantial number of cases brought by counsel for plaintiff in this action and asserting similar claims. The Court will initiate the call.

IT IS SO ORDERED.

/s George W. Miller
GEORGE W. MILLER
Judge